UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br>                Plaintiff, <br><br>       v. <br><br> CHRISTOPHE RIVOIRE, <br><br>                Defendant. | Case No.  19-cv-11701 <br><br> ECF Case <br><br> **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT <u>AND COMMISSION REGULATIONS</u>** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.  <u>SUMMARY</u>

1.      During June and July 2012 (the "Relevant Period"), Christophe Rivoire ("Rivoire" or "Defendant"), while employed as the Head of North American Rates by the U.S. affiliate of a global investment bank (the "Bank"), engaged in a deceptive scheme to manipulate the prices of U.S. dollar interest rate basis swaps published on screens displaying prices from an interdealer broker firm (the "Broker Firm").  Rivoire engaged, and induced a trader under his supervision to engage, in this scheme in order to benefit the Bank in a separate interest rate swap transaction with a bond issuer (the "Issuer").

2.      At the time Rivoire conceived of the manipulative scheme, he knew that the Issuer had an upcoming U.S. dollar-denominated bond issuance with a five-year maturity (the "Bond Issuance") which was going to be priced in mid-July 2012.  Rivoire also knew that to manage its interest rate exposure from the Bond Issuance, the Issuer planned to enter into an interest rate swap (the "Issuer Swap"), and that the Issuer had selected the Bank as its

counterparty on the Issuer Swap.  Rivoire knew that the Issuer had negotiated with the Bank to price the Bond Issuance and Issuer Swap using specific screens displaying prices from the Broker Firm (the "Broker Screens"), including prices for U.S. dollar interest rate basis swaps with a five-year maturity ("Five-Year Basis Swaps").  Rivoire was concerned about whether the Bank would make money on the Issuer Swap, and he knew that the Issuer Swap would be more profitable to the Bank if lower prices for Five-Year Basis Swaps were displayed on the Broker Screens during the pricing of the Bond Issuance and Issuer Swap.  Thus, Rivoire engaged in a deceptive scheme to manipulate the prices of Five-Year Basis Swaps to maximize the Bank's profit on the Issuer Swap, at the expense of the Issuer.

3.     To effectuate the scheme, Rivoire enlisted a trader under his supervision ("Trader A"), who was responsible for trading the Bank's U.S. dollar interest rate basis swaps.  Rivoire explained to Trader A that the Bank might lose money on the Issuer Swap and that the Issuer Swap would be priced off of the Broker Screens.  Rivoire then explicitly directed Trader A to "*push the screen as much as we can before the pricing*" of the Issuer Swap, meaning trade in a manner that would result in a lower price for Five-Year Basis Swaps at the time the Issuer Swap was priced, benefitting the Bank on the Issuer Swap at the expense of the Issuer.

4.     To follow Rivoire's direction to "push the screen," Trader A changed how he typically would have traded.  Trader A knew that to successfully "push the screen" he would need to sell Five-Year Basis Swaps through the Broker Firm close in time to the pricing.  To make sure he could do that, Trader A avoided trading Five-Year Basis Swaps in the days leading up to the pricing, as he otherwise would have.  Trader A also avoided selling Five-Year Basis Swaps through any other interdealer broker firms leading up to the pricing.

2

5.     To make sure he could successfully accomplish the manipulation Rivoire had directed, Trader A also enlisted the help of the Broker Firm before the pricing.  Trader A contacted a broker at the Broker Firm (the "Broker") ahead of the pricing and told the Broker that he would "need to move" the screen for the pricing.  Trader A also directed the Broker to move a price displayed on a screen in the absence of any market activity, and he pushed the Broker to make sure the Broker Screens were controlled in the United States to make them easier to push.

6.     On the morning of the pricing, Trader A began selling Five-Year Basis Swaps through the Broker to push down the prices displayed on the Broker Screens.  Several minutes prior to the pricing, Rivoire came onto the Bank's trading floor and stood near Trader A's desk. When the pricing was imminent, to complete the planned manipulation, Rivoire stood behind Trader A and told him exactly when he should sell a large quantity of Five-Year Basis Swaps through the Broker Firm to move the Broker Screens.

7.     Although both Rivoire and Trader A spoke to the Issuer during the pricing of the Bond Issuance and Issuer Swap and made statements about the prices displayed on the Broker Screens, neither Rivoire nor Trader A disclosed anything to the Issuer about Rivoire's direction to "push the screen as much as we can before the pricing" or Trader A's trading or communications and planning with the Broker.

8.     As Rivoire had intended, the scheme, including Trader A's trading through the Broker, had the effect of moving the spot and, despite a temporary issue, the one-week forward prices of the Five-Year Basis Swap down on the Broker Screens.  The manipulated prices were used to price the Issuer Swap with the Issuer, resulting in a more profitable transaction for the Bank and a less profitable transaction for the Issuer.

9.      Through this conduct and the conduct further described herein, Rivoire engaged in acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26 (2018), and Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1– 190 (2019), specifically Section 6(c)(1) of the Act, 7 U.S.C. § 9(c)(1) (2018), and Regulation 180.1, 17 C.F.R. § 180.1 (2019).

10.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), the Commission brings this action to enjoin such acts and practices and compel compliance with the Act.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

11.     Unless restrained and enjoined by this Court, Rivoire is likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.      JURISDICTION AND VENUE

12.     **Jurisdiction**.  This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012), which provides that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress.  In addition, Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), provides that district courts have jurisdiction to hear actions brought by the Commission for injunctive relief and to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

13.     **Venue**.  Venue properly lies with the Court pursuant to 7 U.S.C. § 13a-1(e),

because acts and practices in violation of the Act occurred within this District.

### III.     THE PARTIES

14.     Plaintiff **Commodity Futures Trading Commission** is an independent federal

regulatory agency that is charged by Congress with the administration and enforcement of the

Act and the Regulations.

15.     Defendant **Christophe Rivoire** is a resident of France.  At all times during the

Relevant Period, Rivoire worked as the Bank's Head of North American Rates at the Bank's

office in Manhattan.  As the Head of North American Rates, Rivoire oversaw the Bank's interest

rates business in North America, including the Bank's New York-based U.S. dollar interest rate

swap traders, and was responsible for the business's revenues; risk; personnel; and policies,

procedures, and controls.  Subsequent to the Relevant Period, Rivoire was listed as a principal of

the Bank and a principal of a U.K. affiliate of the Bank, but has never been registered with the

CFTC in any capacity.

### IV.     FACTS

**The Bond Issuance and the Issuer Swap**

16.     The Issuer is an Asian public financial institution with a mission that includes

promoting international economic and social development and contributing to the stability of the

global financial system.  The Issuer issues bonds to raise funds for, among other things, lending

and investment programs.

17.     In June 2012, the Issuer was moving forward with plans for the Bond Issuance, in

which it would issue U.S. dollar-denominated bonds with a five-year maturity (the "Bonds").

The Bond Issuance was expected to be around $2 billion in notional size and pay a fixed rate to

investors (the "Bond Coupon") every six months.  The Issuer had mandated the Bank as an underwriter and joint lead manager of the Bond Issuance.

18.     The planned Bond Issuance would expose the Issuer to interest rate risk, namely, that prevailing interest rates would rise or fall over the five-year life of the Bonds while the Issuer's obligation to pay investors interest on the Bonds would remain fixed.  The Issuer therefore sought to manage its interest rate exposure by entering into an interest rate swap with one of the underwriters of the Bonds.  Under the Issuer Swap the Issuer would receive the Bond Coupon from its counterparty every six months and would pay the counterparty a floating rate of interest of six-month Libor plus an additional amount.

19.     Pricing the Bond Issuance and Issuer Swap required the use of the prices of other financial instruments, including:

- Five-year U.S. Treasury prices;

- Five-year swap spreads (i.e., the difference, or spread, in basis points between the five-year U.S. Treasury yield and the prevailing market interest rate on five-year U.S. dollar fixed-for-floating interest rate swaps);

- Five-year 6s3s basis swaps (i.e., prevailing market prices of a five-year swap where one party paid the six-month U.S. dollar Libor rate and the other party paid the three-month U.S. dollar Libor rate) (the "Five-Year Basis Swap");

- The one-week forward rate for the Five-Year Basis Swap (i.e., the cost of entering a Five-Year Basis Swap starting one week in the future rather than for immediate, or "spot," settlement).

20.     After soliciting pricing proposals for the Issuer Swap, the Issuer selected the Bank to provide the Issuer Swap.

21.     The Bonds that the Issuer planned to issue were to be priced during a conference call in which the Issuer and the underwriters of the Bond would participate (the "Pricing Call"). The Issuer Swap was also going to be priced during the Pricing Call.  The Pricing Call would include a practice pricing, referred to as a "dry run," and then a live pricing.  To price the Bonds and Issuer Swap, the current rates of the relevant financial products—the five-year U.S. Treasury, the five-year swap spread, the Five-Year Basis Swaps, and the one-week forward rate of the Five-Year Basis Swaps—would be quoted during the Pricing Call.

22.     Because the Bank had been selected to provide the Issuer Swap, traders from the Bank would provide the quotes for the relevant financial products during the Pricing Call.  In its discussions with the Bank over the terms and process for the Bond Issuance and Issuer Swap, the Issuer requested that traders from the Bank quote the current rates of the relevant financial products from specific Broker Screens.

23.     In particular, the Issuer requested that the spot rate for Five-Year Basis Swaps be quoted based on the rate displayed on a screen commonly referred to as "19905."  Further, the spot rate for Five-Year Basis Swaps displayed on another screen ("USDBASIS") was to be subtracted from the one-week forward price displayed on USDBASIS to create a "Forward Rate Adjustment" that would then also be used in pricing the Issuer Swap.

24.     The Broker Screens were accessible through a subscription-based market news service, and banks and other participants in interest rate markets commonly had access to them, and the prices displayed on the Broker Screens would be visible to those in the market who had access to them.

25.     The price levels quoted during the Pricing Call could have a direct impact on the economics of the Issuer Swap.  For example, the additional amount of interest above the six-

month U.S. dollar Libor rate paid by the Issuer to the Bank was to be derived from a formula incorporating the price level for Five-Year Basis Swaps displayed on 19905. Specifically, the lower the Five-Year Basis Swap price on 19905 was during the pricing, the higher the additional amount of interest the Issuer would have to pay to the Bank under the Issuer Swap. Likewise, the formula for deriving the additional amount of interest paid by the Issuer to the Bank incorporated the Forward Rate Adjustment and a negative Forward Rate Adjustment would mean the Issuer had to pay a higher rate of interest to the Bank, while a positive Forward Rate Adjustment would decrease the amount of interest the Issuer had to pay the Bank.

26.     Changes in the price levels of Five-Year Basis Swaps on the Broker Screens would thus make the Issuer Swap more or less profitable for the Bank. For example, if the price of Five-Year Basis Swaps moved lower by 0.2 basis points, the Issuer would correspondingly pay the Bank an interest rate above the six-month U.S. dollar Libor rate that was 0.2 basis points higher. Similarly, if the Forward Rate Adjustment moved lower by 0.2 basis points, the Issuer would correspondingly pay the Bank an interest rate above the six-month U.S. dollar Libor rate that was 0.2 basis points higher. And if both the price of Five-Year Basis Swaps and the Forward Rate Adjustment moved lower by 0.2 basis points, the Issuer would have to pay the Bank an interest rate about six-month U.S. dollar Libor that was 0.4 basis points higher.

**Rivoire's Concerns About the Bank's Potential Losses**

27.     In late June 2012, Defendant Rivoire was aware of the upcoming Bond Issuance and Issuer Swap. During the earlier negotiations over the Issuer Swap, Rivoire had provided pricing levels at which the Bank and its affiliates would be willing to enter into the Issuer Swap. The Issuer took into account the pricing levels Rivoire provided when selecting the Bank as a

joint lead manager of the Bond Issuance.  Based on the pricing levels provided by Rivoire, the Issuer also selected the Bank and its affiliates to provide the Issuer Swap.

28.     By late June, however, Rivoire had come to believe that the prices he had provided for the Issuer Swap had failed to account for certain economic terms of the Issuer Swap, and that therefore the Bank had agreed to enter into the Issuer Swap with the Issuer at a price at which the Bank would lose money.  A loss on the Issuer Swap would impact the profitability of the interest rate business that Rivoire supervised and could reflect negatively on Rivoire's management of the business or affect Rivoire's compensation.

29.     Concerned about potentially losing money on the Issuer Swap, Rivoire repeatedly pushed for the Bank to re-negotiate the terms of the Issuer Swap with the Issuer, including charging the Issuer more for the swap.  Rivoire's efforts, however, were ultimately unsuccessful.

30.     Rivoire was able to get the Debt Capital Markets ("DCM") business of the Bank to pay a subsidy to the trading desks that Rivoire supervised to offset some of the potential loss on the Issuer Swap.  Even with the subsidy, however, Rivoire stated that "P&L will be zero for the swap book."

31.     By early July 2012, moreover, Rivoire had been reminded that the Issuer Swap would be priced not only with reference to the five-year U.S. treasury and five-year swap spread rates, but also with reference to the Five-Year Basis Swap, something which Rivoire said "makes another huge difference" in the profitability of the Issuer Swap to the Bank.  The subsidy DCM had agreed to pay to the businesses under Rivoire's supervision did not take into account that the Issuer Swap would be priced with reference to the Five-Year Basis Swap.

32.     Rivoire repeatedly complained about the negotiations with the Issuer over various aspects of the Issuer Swap, at one point characterizing the situation as "ridiculous."

33.     Rivoire also consistently expressed concern that the Bank might lose money on the Issuer Swap and repeatedly indicated that the Bank needed to minimize and avoid losses, stating that "we can not accept further losses on this transaction" and that "[w]e can not continue to accept all [the Issuer's] costly requirements."

**Rivoire's Statements About Pushing Markets and Controlling the Pricing**

34.     In a number of communications in late June and early July 2012, Rivoire articulated how the Bank and its affiliates could engage in manipulative trading to minimize the losses he anticipated on the Issuer Swap.  Rivoire articulated two related ways that the Bank could do this: "push[ing]" the markets for relevant financial products and "controlling" the Pricing Call.

35.     On June 27, 2012, Rivoire spoke about the Issuer Swap with the Co-Head of Rates, Asia-Pacific (the "Co-Head of Rates"), an executive employed by an affiliate of the Bank in Asia.  Rivoire and the Co-Head of Rates discussed the pricing of the Issuer Swap.  Rivoire described to the Co-Head of Rates how traders at the Bank could "push the market" with their trading and mitigate the loss that Rivoire anticipated on the Issuer Swap.

36.     Specifically, Rivoire explained to the Co-Head of Rates that traders could "*push the [U.S. treasury] market, I mean obviously, a tick or whatever*" by buying five-year U.S. treasuries related to the Bond Issuance, which would allow the Bank to make an additional $300,000 to $400,000 on the transaction.

37.     Rivoire further explained to the Co-Head of Rates that the Bank could make additional money on the Issuer Swap "*if we can push the [swap] spreads a quarter of a basis point*."  Rivoire and the Co-Head of Rates discussed that if the Issuer Swap was "priced in Asian time," they would have "a higher probability" of pushing the swap spread market.  Rivoire noted

to the Co-Head of Rates that the Bond Issuance would most likely be priced in U.S. time and

they would have to take into account "how much can we push the market" if the Bank's traders

in New York were pricing the transaction.

38.     In other internal communications, Rivoire stated repeatedly that the Bank needed

to "drive" and "control" the execution of the Issuer Swap to reduce the losses he anticipated.  In

one such communication, Rivoire stated that the Bank needed to "drive the execution process" of

the Bond Issuance and Issuer Swap "to minimize the losses."  In another communication, Rivoire

reiterated that his goal was to "minimize" the loss on the Issuer Swap "as much as possible in

executing the trade smoothly and efficiently," which would require the Bank to "control the

execution process and not [the Issuer]."  Rivoire concluded that "[t]he more we control it, the

more we minimize the cost."  And in a third communication, Rivoire stated that "we need to

control the execution of the transaction and not [the Issuer].  If it is not the case, the return may

be dramatically lower."

39.     In a phone call with a DCM employee of an Asian affiliate of the Bank ("DCM

Employee"), Rivoire expanded on what it would mean to control the execution of the Issuer

Swap rather than allowing the Issuer to control it.  In connection with quoting the U.S. treasury

price, Rivoire explained that "we need to manage the execution" and "we don't want the issuer

to manage it."  Rivoire then continued, "Managing the execution, what does it mean?" and

explained "we need to keep the flexibility to quote when we want to quote, right?" Rivoire

further explained that "we need to quote it in the sense that if we quote it we can manage the

timing."

40.     In response to Rivoire's expressed concerns about being able to control the

execution of the Issuer Swap and the timing of the quotes provided on the Pricing Call, the DCM

Employee assured Rivoire that the Bank would be able to do so.  The DCM Employee explained

that the Issuer "is not trying to manage this process.  *Issuer is just innocent*, and just look[s] at

[the Broker Screens], that's it."  The DCM Employee further explained that the Issuer was "not a

player in the market," but instead the Issuer's employees were "innocent people in [Country A]."

The DCM Employee explained that that meant that "So long as [the U.S. treasury rate] shows on

[Broker Screen], they agree, they never challenge you, because they are not trading in treasury.  I

think you misunderstood.  *They are not professional; they are just [Country A] government

people*."

41.     On the day before the Pricing Call, Rivoire had another conversation about the

Issuer Swap with an executive at an affiliate of the Bank in the U.K.  Rivoire again stressed the

need to control the Pricing Call.  Rivoire told the employee that the Issuer Swap would be

"costly," although exactly how costly "depends on what we can do."

42.     Thus, prior to the Pricing Call, Rivoire had expressed the belief that pushing the

markets for relevant financial products was a way to avoid the losses he anticipated on the Issuer

Swap and that it was also important to control the timing of when rates were quoted on the

Pricing Call to minimize the losses he anticipated.  Further, Rivoire had been assured by the

DCM Employee that the Issuer was "innocent" and "not a player in the market," and that the

Issuer would not challenge the rates that appeared on the Broker Screens.

**Rivoire's Direction to Trader A To Manipulate the Five-Year Basis Swap**

43.     On July 2, 2012, Rivoire emailed three of the traders under his supervision who

also worked from the Bank's office in Manhattan—Trader A, who was responsible for trading

the Bank's U.S. dollar interest rate basis swaps, and two traders responsible for trading the

Bank's swap spreads—to provide them with information about the Broker Screens that would be

used to price the Issuer Swap.  Rivoire explained that the Issuer Swap would be priced with reference to the Five-Year Basis Swap and commented that the price the Bank had quoted to the Issuer for the Issuer Swap had not taken the Five-Year Basis Swap into account.  Rivoire told all three traders that they would need to "optimize the execution" of the Issuer Swap because of the mispricing.

44.     Trader A responded to Rivoire and Trader A's direct supervisor, who was also under Rivoire's supervision, on July 5, 2012, asking if the transaction was "something I should be trying to prehedge now?"  Trader A also stated that "*2 billion 6s3s 5yrs will move the marke*t" and asked "[a]re we the only ones seeing it?"

45.     Rivoire responded the same day, telling Trader A "We are not the only one to be aware of the trade but definitely the only one to do it. It won't be splitted.  Timing next Tuesday or Wednesday subject to market conditions."  Rivoire then continued "*So we'll need to push the screen as much as we can before the pricing.  We are not comitted [sic] to any level except the mid screen.*"  Finally, Rivoire also responded to Trader A's question about pre-hedging, stating that it "may be indeed good to start to pre hedge it as we have the visibility."

46.     In this transaction "push[ing] the screen" down would increase the rate of interest the Issuer had to pay to the Bank under the Issuer Swap and thus tend to increase the profitability of the transaction for the Bank.

**Trader A's Response to Rivoire's Direction**

47.     Trader A understood Rivoire's email to be a direction to trade in a manner that would result in a lower price for Five-Year Basis Swaps at the time the Issuer Swap was priced, and he understood that that would benefit the Bank on the Issuer Swap at the expense of the Issuer.

48.    Trader A understood that he had to follow Rivoire's instruction to "push the screen as much as we can before the pricing," as Rivoire was the Head of North American Rates, oversaw the Bank's business which included Trader A's desk, and thus supervised Trader A.  As a supervisor of Trader A, Rivoire had the authority to direct Trader A's trading and was involved in determining Trader A's performance rating and compensation at the Bank.

49.    After receiving Rivoire's direction, Trader A told another trader under Rivoire's supervision ("Trader B") "so this deal gonna be like 2-2.5b[illion] 6s3s 5yrs[,] i have to buy at mid[,] and i have to move [the Broker Firm's] screen."  Later, Trader A told Trader B "CR said to push [the price] to 13 llol."  When Trader B jokingly suggested that he could front run Trader A by selling before Trader A on the morning of the Pricing Call but before the pricing was imminent, Trader A responded "CR [will] kill u."  Trader A and Trader B used the term "CR" to refer to Rivoire.

50.    To accomplish "push[ing] the screen" as Rivoire had directed, Trader A knew he would need to sell Five-Year Basis Swaps through the Broker Firm, the firm that controlled the Broker Screens, close in time to the pricing so that the price for Five-Year Basis Swaps displayed on the Broker Screens would be lower at the time the Issuer Swap was priced.

51.    While typically—as Trader A had suggested in his July 5 email to Rivoire—Trader A would attempt to pre-hedge a transaction like the Issuer Swap in the days prior to the pricing, because of Rivoire's instruction to "push the screen" and to ensure he had enough Five-Year Basis Swaps to sell close in time to the pricing, Trader A took steps to avoid trading Five-Year Basis Swaps in the days leading up to the pricing.

52.     On July 10, the day before the pricing, Trader B urged Trader A to "start selling" and Trader A responded that it was "too early," and that he was "not hitting down today[,] tomorrow i hit downb [sic]."

53.     Further, to have the most effect on the Broker Screens, before the Pricing Call on the day of the pricing, Trader A avoided selling Five-Year Basis Swaps through any other interdealer broker firms.  Instead, the morning before the pricing Trader A traded Five-Year Basis Swaps only through the Broker Firm, even though Trader A generally preferred to trade U.S. dollar interest rate basis swaps through another interdealer broker firm.

54.     Before the Pricing Call, Trader A told Trader B that "[the Broker] has screen[,] can't trde [sic] away from him."  Trader A later told Trader B that trading through the Broker Firm was "not my 1st choice" and that it "would have been much easier" to trade through his preferred broker firm.

55.     After the Pricing Call, Trader A expressed the same view to a broker who worked for his preferred broker firm.  Trader A explained that he had traded through the Broker Firm because he "needed the screen," and—as he had also told Trader B—stated that the Broker Firm was "not my first choice."  Later Trader A expressed to the other broker that the screen published by Trader A's preferred broker firm "definitely would have been preferable."

**Trader A's Communications with the Broker**

56.     In order to follow Rivoire's direction to "push the screen" before the pricing, Trader A told Rivoire that he would "try to find out who controls [the Broker Firm's] screen."

57.     As he had told Rivoire he would, Trader A contacted the Broker on July 9, two days before the Pricing Call.  Trader A told the Broker that "we're pricing something and they're using" the USDBASIS screen.  Trader A then told the Broker "*I'm going to need to move that*"

and "*I'm going to give you prices and I just need you to move it.*"  The Broker told Trader A "I understand" and agreed to look into who at the Broker Firm or its affiliates controlled USDBASIS.  This communication with the Broker was unusual for Trader A.

58.     Trader A additionally sent the Broker the names of USDBASIS and the 19905 screen by chat, and indicated that the upcoming pricing would take place in the next several days.  The Broker responded that he would check up on the screens.

59.     Later on July 9, Trader A checked back in with the Broker about whether the Broker had found information about the Broker Screens.  The Broker said he thought he would soon have information about the Broker Screens, to which Trader A responded "good, because I think it's going to be substantial."  The Broker again responded "I understand."

60.     The Broker later followed up with Trader A to indicate that 19905 would be controlled by the Broker Firm in the United States, and that USDBASIS and 19905 should move in tandem.   The Broker suggested that Trader A pick a tenor to transact in "and we'll do something and see if, you see, you know, if it moves."  Trader A stated that he would "give it a try" the next day.

61.     The following morning, July 10, the day before the Pricing Call, Trader A again reached out to the Broker to discuss the Broker Screens.  Trader A pointed out that USDBASIS was showing a higher price for Five-Year Basis Swaps than 19905.  Trader A told the Broker that the discrepancy was a problem because USDBASIS was "*the one I need to fucking move*."  Trader A told the Broker to "see what you can do," and the Broker agreed.

62.     Later that morning the Broker followed up with Trader A and explained that USDBASIS was still controlled by Broker Firm affiliates in London, but by the afternoon it would be controlled by the Broker Firm in the United States.  Trader A said that that would be

helpful to him, and urged the Broker to try to move control of USDBASIS to the United States

on July 10 even though the pricing was "probably going to be tomorrow."  The Broker said he

understood.

63.     Trader A kept Rivoire informed of his interactions with the Broker.  Trader A

reported to Trader B that Trader A had "told CR … on Monday," July 9, that "it would be a

problem" to move the Broker Screens, but that Rivoire had responded "'just tell [the Broker] to

mmove [sic] it."  On July 10, Rivoire told an employee of the Bank that using the Broker Screens

to quote the Five-Year Basis Swap "was probably manageable," but that "something else we

have discovered" was that the one-week forward price on USDBASIS "is wrong on the page."

**Trader A's Predictions About the Manipulative Scheme**

64.     Both in the days leading up to the pricing and the morning of July 11 prior to the

Pricing Call, Trader A and Trader B speculated together about how low Trader A could move the

price of Five-Year Basis Swaps on the Broker Screens and what the consequences of his trading

would be.

65.     For instance, on July 10, the day before the Pricing Call, Trader A suggested to

Trader B that he would get the "screen down 0.50 bps."  On July 11, the morning of the Pricing

Call, Trader A told Trader B "i'll get it down to 15 or 14.75."

66.     Later during the morning of July 11, after Trader A told Trader B "CR said push

it to 13," Trader B responded "lol yeah good luck" and speculated that Trader A might be able to

move it that far if he had $5 billion worth of Five-Year Basis Swaps to sell, but he would not be

able to push the price down even one basis point selling only $2.5 billion worth of Five-Year

Basis Swaps.  Trader A insisted he would be able to "get it to 14.5."  Trader A's goal was thus,

as repeatedly expressed to Trader B, to try to sell *low* (thus benefiting the Bank on the Issuer

Swap, as Rivoire had directed) rather than to sell high, even though selling lower would be economically worse for Trader A and the Bank on sales of Five-Year Basis Swaps.

67.    Trader A also speculated to Trader B about the Issuer's reaction to seeing the price of Five-Year Basis Swaps move down as a result of Trader A's manipulative trading.  On the day prior to the Pricing Call, Trader A told Trader B that he was waiting for the Issuer to "b[i]tch" and refuse to enter into the Issuer Swap when the Issuer saw the price of Five-Year Basis Swaps move from 15.5 basis points to 15 basis points.

68.    Similarly, on July 11, the morning of the Pricing Call, Trader B asked Trader A if the Issuer was "going to go crazy if they see the screen move 10min b4 pricing[?]"  Trader A told Trader B that he did not care what the Issuer's reaction was because the Issuer insisted on using the Broker Screens to price the Issuer Swap "so they gonna get it."

**The Morning Before the Pricing Call**

69.    Trader A spent the morning of the Pricing Call, July 11, preparing to implement Rivoire's scheme to move prices during the Pricing Call in three ways.  First, Trader A stayed in regular contact with the Broker and tried to ensure that the Broker could control the Broker Screens.  Second, Trader A directed the Broker to ensure that the one-week forward price was lower than the spot price on USDBASIS.  Third, Trader A began offering to sell Five-Year Basis Swaps at increasingly lower levels to move prices down.

70.    On July 11, the morning of the Pricing Call, Trader A told the Broker that he would offer to sell Five-Year Basis Swaps at a price of 15.75 basis points.  Shortly thereafter, one or more individuals at the Broker Firm or its affiliates moved the price of Five-Year Basis Swaps on USDBASIS from 15.8 to 15.6 basis points and moved the price on 19905 from 15.75 to 15.5 basis points.

71.     Both screens, however, soon moved back up to 15.8 and 15.75 basis points, respectively.  After the move back up, Trader A contacted the Broker to inquire about the prices shown on the Broker Screens, "to make sure that you got control, ok?"  The Broker stated that "I'm watching it" and "we just knocked it back down."

72.     Shortly after the call between the Broker and Trader A, one or more individuals at the Broker Firm or its affiliates moved the price on USDBASIS from 15.8 basis points to 15.5 basis points and moved the price on 19905 from 15.75 basis points to 15.5 basis points.

73.     Later that morning, Trader A again contacted the Broker about the relevant screens.  Trader A told the Broker that not only did he need to move the spot price of Five-Year Basis Swaps on USDBASIS, but he needed to move the one-week forward price for Five-Year Basis Swaps on the USDBASIS screen as well.  Trader A told the Broker that the one-week forward price for Five-Year Basis Swaps was currently the same as the spot price, but "it's got to be lower."  When the Broker asked if Trader A would like the one-week forward price on USDBASIS to be one-tenth of a basis point lower than the spot price for Five-Year Basis Swaps ("alright, so like 15.4?"), Trader A told the Broker to "make it two-tenths" lower.  This request from Trader A was unusual, and it would have been inappropriate for the Broker to move the one-week forward price based on Trader A's request, as the one-week forward price should have moved only based on changes in market conditions and prices and not in response to the request from Trader A.

74.     The one-week forward price, and its relationship to the spot price, had economic ramifications for the Issuer Swap, as the spot price was subtracted from the one-week forward price to create the Forward Rate Adjustment.  If the Forward Rate Adjustment was negative (that is, if the one-week forward price was lower than the spot price), than the floating rate of interest

the Issuer had to pay to the Bank every six months would increase.  The more negative the

Forward Rate Adjustment was, the larger the increase in the interest rate the Issuer had to pay.

For example, a Forward Rate Adjustment of negative 0.3 basis points would mean that the Issuer

had to pay 0.2 basis points more interest to the Bank than a Forward Rate Adjustment of only

negative 0.1 basis points.  Likewise, a positive forward rate adjustment would decrease the

interest rate that the Issuer had to pay to the Bank under the Issuer Swap.

75.     About thirty minutes later, Trader A followed up with the Broker about the one-

week forward price and the spot price.  Trader A again complained that the one-week forward

price was the same as the spot price.  The Broker offered to remove the one-week forward price

entirely from USDBASIS, but Trader A said "that'll cause me a lot of problems."  Trader A

asked the Broker to "keep working on it."  Trader A also lowered his offer to sell Five-Year

Basis Swaps to 15.5 basis points.

76.     Over approximately the next thirty minutes, Trader A lowered his offer to sell

through the Broker again.  This lower offer was accepted, or "lifted," by several market

participants, and Trader A traded $750 million Five-Year Basis Swaps at prices of 15.25 and

15.375 through the Broker.

77.     After Trader A finished trading, the price of Five-Year Basis Swaps on

USDBASIS was displayed as 15.4 basis points and the price on 19905 was displayed as 15.5

basis points.  All told, as a result of Trader A's market activity on the morning of the Pricing

Call, Five-Year Basis Swaps had moved from 15.8 to 15.4 on USDBASIS and from 15.75 to

15.5 on 19905.

78.     After these trades and the related screen movements, Trader A and Trader B

discussed Trader A's trading, the effect it had already had on the Broker Screens, and whether

Trader A would be able to move screen levels further.  Trader B commented that Trader A had moved the price of Five-Year Basis Swaps three-eighths of a basis point so far, but had already sold a large amount of Five-Year Basis Swaps.  Trader B said that there was "no way" Trader A would move the price down an entire basis point as Trader A had earlier suggested he would be able to move it.  Trader A agreed, and noted that he was "fked" and that his trading was "too early also" because it was too far in advance of the Pricing Call, which Trader A had been informed minutes before was anticipated to begin at 11:15am.  Trader A told Trader B "ideally[,] nothing trdes [sic] until 11:15[am,] and I hit down to 15[,] ideally."

79.     At 11:08am, Trader A spoke to the Broker.  The Broker told Trader A that he currently had a bid to buy $100 million worth of Five-Year Basis Swaps at a price of 15.375.  Trader A warned the Broker that he would be seeking to trade through the Broker soon, saying "I'm going to come back to you shortly, ok?"  Trader A told the Broker, "don't go anywhere."

80.     Two minutes later, Trader A called the Broker back to inquire why 19905 was showing a price of 15.5 basis points when the last trade had been at 15.375 basis points.  Trader A told the Broker that he needed both 19905 and USDBASIS "ducking down."

**The Pricing Call**

81.     The Pricing Call began at 11:28am on July 11, with some preliminary matters and the pricing dry run.  At 11:32am, Rivoire told a coworker that he had to get off the phone because the Pricing Call for the Issuer was beginning.

82.     At approximately 11:36am, during the dry run on the Pricing Call, an employee of the Bank quoted the Five-Year Basis Swap price from 19905 as 15.5 basis points.  The Bank employee quoted negative 0.1 basis points as the difference between the Five-Year Basis Swap

spot price of 15.4 basis points on USDBASIS and the one-week forward price of 15.3 basis points on USDBASIS.

83.     At approximately 11:37am, the participants on the Pricing Call began the live pricing of the Bond Issuance and Issuer Swap.  Several seconds later, Trader B asked Trader A "when u going to try and hit[?]"

84.     By this time, Rivoire was standing on the trading floor near Trader A and other traders under his supervision who were involved in the Pricing Call.  At around the same time that the live pricing on the Pricing Call began, Rivoire directed Trader A to begin trading to move the Broker Screens down.

85.     As Rivoire knew, and as dictated by the terms of the Issuer Swap, moving the price of the Five-Year Basis Swap down—for example, by selling during the Pricing Call— would let the Bank enter into the Issuer Swap on terms that were more favorable for the Bank and less favorable for the Issuer.

86.     As a result of Rivoire's direction to begin trading, Trader A told the Broker that he would sell to, or hit the bid of, the market participant who had bid to buy Five-Year Basis Swaps at a price of 15.375 basis points.  Trader A told the Broker that he wished to sell $500 million worth of Five-Year Basis Swaps at the price of 15.375.

87.     Almost immediately, Trader A repeatedly told the Broker to "get the screen down."  After approximately fifteen seconds had elapsed, Trader A said "NOW [Broker]!" Trader B, who could hear the conversation between the Broker and Trader A, chatted to Trader A "fk [sic]."

88.     The Broker confirmed that Trader A had traded $500 million Five-Year Basis Swaps, and Trader A immediately demanded again that the Broker "get the screen down."  The Broker told Trader A he was "doing it right now."

89.     At 11:37am, after the live pricing on the Pricing Call had begun, and after Trader A hit the bid at a price of 15.375 basis points and traded $500 million worth of Five-Year Basis Swaps at the time Rivoire directed him to trade, one or more individuals at the Broker Firm or its affiliates moved the price of Five-Year Basis Swaps on USDBASIS from 15.4 to 15.3 basis points and the price on 19905 from 15.5 to 15.25 basis points.  These moves were in violation of the Broker Firm's conventions for moving the Broker Screens; under the Broker Firm's conventions, USDBASIS should have remained at 15.4 and 19905 should have remained at 15.5.  Nevertheless, one or more individuals at the Broker Firm or its affiliates moved USDBASIS and 19905 to satisfy Trader A's demands to the Broker that the Broker "get the screen down."

90.     However, the one-week forward price for Five-Year Basis Swaps on USDBASIS did not move.  At approximately 11:38am, Trader A demanded that the Broker "get the forward one down."  The Broker said he would.  Several times over the next two minutes, Trader A spoke angrily to the Broker about the one-week forward price, at one point stating "you really couldn't get the forward down?"  The Broker repeatedly stated he was "working on it."  Trader A told the Broker "that's fucking terrible."

91.     At 11:40am, in an attempt to move the one-week forward price on USDBASIS, one or more individuals at the Broker Firm or its affiliates moved the price of Five-Year Basis Swaps on USDBASIS from 15.3 to 15.2 basis points.  Those individuals moved the price level in the absence of any actual market activity at the Broker Firm and in contravention of the Broker

Firm's rules, which only permitted such screen moves when there had been an actual trade or an actionable bid or offer.

92.     On the Pricing Call, at approximately 11:40am, an employee of the Bank located on the trading floor near Trader A and Rivoire quoted the price of Five-Year Basis Swaps as 15.25 basis points based on the price displayed on 19905.  The Bank employee quoted the price of Five-Year Basis Swaps on USDBASIS as 15.2 basis points, but the one-week forward price on USDBASIS remained at 15.3 basis points, leading to a Forward Rate Adjustment of positive 0.1 basis points (or a change of 0.2 basis points from where it had been during the dry run).  The Bank employee tried to quote the Forward Rate Adjustment as negative 0.1 basis points rather than the positive 0.1 basis points reflected on the USDBASIS screen, but someone on the Pricing Call objected that negative 0.1 basis points was not correct.  The negative 0.1 basis point Forward Rate Adjustment quoted by the Bank employee would have been more profitable for the Bank than the positive 0.1 basis point level reflected on USDBASIS.  The Bank employee stated that he needed to talk to the Bank's basis trader.

93.     At approximately 11:41am, Trader A yelled at the Broker "you're fucking killing me!"  The Broker replied "I know."

94.     At approximately 11:42am, Trader A threatened to stop using the Broker as his broker in the future, yelling, "I'm going to pull your fucking line forever!"  The Broker stated that the Broker Firm was working on it.

95.     On the Pricing Call, at approximately 11:42am, the Bank employee continued to state that the Forward Rate Adjustment should be negative 0.1 basis points (a more profitable level for the Bank) rather than positive 0.1 basis points, the Forward Rate Adjustment based on the prices actually displayed on the USDBASIS screen.

96.     At approximately 11:43am, Trader A spoke on the Pricing Call.  Trader A stated that USDBASIS "has a delay on it" and "there's a problem with the screen right now."  Trader A argued that it was "impossible" for the forward price to be higher than the spot price.  Trader A did not indicate that he had recently traded to move the Broker Screens down, that he was currently speaking to anyone from the Broker Firm, or that he had asked anyone from the Broker Firm ahead of time to make the difference between the spot and one-week forward prices of Five-Year Basis Swaps displayed on USDBASIS two-tenths of a basis point.

97.     At 11:43am, in another attempt to move the one-week forward price on USDBASIS, one or more individuals at the Broker Firm or its affiliates moved the price of Five-Year Basis Swaps on USDBASIS from 15.2 to 15 basis points and the price on 19905 from 15.25 to 15 basis points. These moves again occurred in the absence of any actual market activity at the Broker Firm and again violated the Broker Firm's rules for moving screens.

98.     At approximately 11:43am, after he spoke on the Pricing Call, Trader A got back on the phone with the Broker and yelled "[Broker] I swear to god!"

99.     On the Pricing Call, at approximately 11:44am, participants noted that the spot price of Five-Year Basis Swaps on USDBASIS had now moved down to 15 basis points but the one-week forward price remained at 15.3 basis points.  Trader A again spoke on the pricing call, stating, "there's a problem with their page, obviously."  Once again, Trader A did not indicate anything about his own trading activity to move the Broker Screens down or his conversations with anyone from the Broker Firm.

100.    Since directing Trader A when to begin trading to move the Broker Screens down, Rivoire had remained near Trader A and the other traders under his supervision who were involved in the Pricing Call.  During that time, Rivoire could hear both the Pricing Call and

Trader A's conversations with the Broker and was also engaging with Trader A.  As Trader A stated to Trader B in a chat after the Pricing Call, "i mean, i had the head of rates standing over my shoulder going WTF IS GOING ON."

101.    At approximately 11:46am, Rivoire spoke on the Pricing Call.  Rivoire told representatives of the Issuer and others on the Pricing Call that there was "a latency issue" on the USDBASIS screen since "the spot has already moved significantly since we priced, and the forward didn't move."  Rivoire further stated that "We need to wait for the screen to be adjusted."  Rivoire also asserted that "Obviously we are not controlling the screen."  The Issuer agreed to wait.  Rivoire did not reveal that he had directed Trader A to "push the screen" before the pricing, that he had directed Trader A when to trade during the Pricing Call to move the Broker Screens down, or that Trader A was speaking or had spoken to anyone from the Broker Firm about moving USDBASIS.

102.    At approximately 11:46am, Trader A spoke again to the Broker.  The Broker said that they were "trying to get it down" but there was a "problem with the screen."  The Broker admitted that "we moved the front end, the, the spot down to 15 trying to move" the one-week forward price.

103.    At approximately 11:48am, a participant on the Pricing Call suggested using the difference between the spot and one-week forward prices as they had been quoted during the dry run of the pricing, which would mean a Forward Rate Adjustment of negative 0.1 basis points.

104.    At 11:48am, one or more individuals at the Broker Firm or its affiliates moved the price of the one-week forward on USDBASIS from 15.3 to 15.2 basis points and at 11:49am, one or more individuals at the Broker Firm or its affiliates moved the one-week forward price to 15.1.

105.     At approximately 11:49am, Trader A spoke again to the Broker, saying "you can't just overwrite the fucking thing?"  The Broker noted that the one-week forward was "getting closer" and had moved to 15.2 and then to 15.1 basis points.

106.     On the Pricing Call, at approximately 11:49am, Rivoire responded to the suggestion to use a Forward Rate Adjustment of negative 0.1 basis points, saying to the Issuer and others on the call, "we're not going to be able to use the dry run number in the sense that the spot has moved slightly but the spot has moved and we cannot ignore it."  He also noted that the one-week forward price had moved to 15.1 basis points on USDBASIS.  Rivoire did not reveal that he had directed Trader A to trade between the dry run and the live pricing of the Pricing Call to move the Broker Screens, that Trader A's trading had moved the price of the Five-Year Basis Swaps on the Broker Screens after the dry run, or that Trader A was speaking to anyone from the Broker Firm about moving the USDBASIS screen.

107.     At approximately 11:51am, Trader A spoke to the Broker and asked if the Broker Firm could get the one-week forward to be "flat," or the same as the price of the Five-Year Basis Swap.  The Broker replied "I pushed the ones down to 15 trying to manipulate it."  The Broker then asked if it would "work" for Trader A if the Broker Firm moved the spot price to 15.3 basis points and the one-week forward to 15 basis points on USDBASIS.

108.     Consistent with the Broker's question to Trader A, at 11:51am, one or more individuals at the Broker Firm or its affiliates moved the price of Five-Year Basis Swaps on USDBASIS from 15 to 15.3 basis points and the price on 19905 from 15 to 15.25 basis points. They also moved the one-week forward price on USDBASIS from 15.1 to 15 basis points.

109.     The difference of 0.3 basis points between the spot and one-week forward prices displayed on the USDBASIS screen was not based on actual market activity and was not an

appropriate difference between the spot and one-week forward prices.  Individuals at the Broker

Firm or its affiliates knew that this difference was not justified by market activity or otherwise

appropriate to display, but they displayed it to satisfy Trader A's demands to the Broker.

110.     On the Pricing Call, at approximately 11:51am, an employee of the Bank asked

the Issuer and other participants on the call if they could use the prices then displaying on

USDBASIS, 15.3 basis points for the Five-Year Basis Swap and 15 basis points for the one-

week forward.  Rivoire responded, "Ok if you want to spot what we have on the screen now,

which is 15.3 for the spot, and 15 for the forward, that's fine for us."  Rivoire again did not

indicate anything about his direction to Trader A to trade to move the prices on the Broker

Screens down or that Trader A was speaking to anyone from the Broker Firm about the

USDBASIS screen.

111.     At approximately 11:52am, Trader A told the Broker not to move the prices on

USDBASIS (which at that time, as Rivoire had just stated on the Pricing Call, was displaying

15.3 basis points for the spot price and 15 basis points for the one-week forward price).  The

Broker told Trader A that the one-week forward was "stuck" at 15 and that if Trader A "want[ed]

it up again, let me know."  The Broker told Trader A that the fact that the one-week forward had

not moved was caused by an issue when the Broker Firm in the United States took control of the

Broker Screens.  Trader A stated loudly, "I asked you three fucking days ago to find this out."

112.     Approximately ten seconds after Trader A told the Broker not to move the prices

on USDBASIS, Rivoire asked on the Pricing Call if the Issuer would agree to use the prices

displayed on USDBASIS (15.3 basis points on the Five-Year Basis Swaps and 15 basis points on

the one-week forward).  The negative 0.3 basis point Forward Rate Adjustment generated from

those numbers was even more favorable for the Bank than the negative 0.1 basis point Forward

Rate Adjustment initially quoted by another Bank employee earlier on the pricing call.  Rivoire

again did not indicate anything about his direction to Trader A to trade to move the price on the

Broker Screens down or that Trader A was speaking to anyone from the Broker Firm about the

USDBASIS screen.

113.    At approximately 11:53am, the Issuer agreed to use the prices displayed on

USDBASIS (15.3 basis points and 15 basis points) to price the Issuer Swap.

114.    When the Issuer Swap was priced using 15.3 and 15 basis points, those values

resulted in a Forward Rate Adjustment of negative 0.3 basis points.  Adding that negative

number to the price of the Five-Year Basis Swap quoted from 19905, 15.25 basis points, resulted

in an adjusted price of 14.95 basis points.

115.    The prices of Five-Year Basis Swaps displayed on 19905 and USDBASIS which

were used to price the Issuer Swap during the Pricing Call were lower than they otherwise would

have been as a result of Trader A trading $500 million worth of Five-Year Basis Swaps during

the Pricing Call to move the Broker Screens down.  The prices used to price the Issuer Swap

were also lower than they otherwise would have been as a result of Trader A urging the Broker,

after Trader A's manipulative trading, to move the Broker Screens, including the one-week

forward price, down.  Trader A traded during the Pricing Call to move the Broker Screens down

and urged the Broker to move the Broker Screens down as a result of Rivoire's manipulative

scheme to "push the screen as much as we can before the pricing."  These lower prices resulted

in the Issuer Swap being economically worse for the Issuer than it otherwise would have been.

**Events After the Pricing Call**

116.    After the Pricing Call, Trader A and Trader B recounted to each other what had

happened.  Trader B stated "that was pretty fked up."  Trader A asked "did u hear CR[?]"  Trader

B later commented, "that math cr did[] was lolz."  Trader A responded "14.95[,] gotta hand it to

him," referring to the adjusted price of Five-Year Basis Swaps used to price the Issuer Swap

after the Forward Rate Adjustment was applied.  Trader A also commented "i can't talk over

CR[,] he needs to be the one difusing [sic] that[,] not me[.]  i can't go and tell them the screen is

wrong[,] they need to hear it from him[.] i did say it[.] and he smooth talked 14.95."  Trader B

noted that it was "easier with french accent[,] anyone else comes off as angry."

117.    Trader A and Trader B then discussed their earlier predictions about how much

Trader A could move the Broker Screens through his trading.  Trader A stated he sold $1.5

billion in basis swaps and "got 15" on the Broker Screens, whereas he had thought he could

move the price to 14.75 through his trading.  Trader A then continued that the price on the

Broker Screens "was 15.8 this morning[,] i'll take it."  Later, Trader A commented to Trader B

that the price for Five-Year Basis Swaps "*should be higher than yest[erday,] i really pushed it

down*."  Trader A commented that his trading "actually went really well" except for the issue

with USDBASIS.

118.    Trader A and Trader B also discussed the Broker.  Trader B commented that

"anyone with half a brain would have checked b4 hand[] if they really had full control."  Trader

A responded that he had told Rivoire "it would be a problem[] on Monday," but that Rivoire had

responded "'just tell [the Broker] to mmove [sic] it.'"

119.    Trader A also discussed the Issuer Swap with a trader at another financial

institution.  Trader A noted that he had done "2 billion 6s3s today" as part of the Issuer Swap.

The other trader asked Trader A how he had gotten out of the risk, and Trader A stated "i hit the

sh[i]t out of it[] before hand" and it "worked out[] amazingly."  Trader A told the other trader

that he had "*moved the damn thing ... 0.75*."

**Rivoire's Scheme Was Deceptive to the Issuer and Other Market Participants**

120.     Rivoire's manipulative scheme was deceptive to the Issuer.  The Issuer was not told that Rivoire had directed Trader A to "push the screen as much as we can before the pricing" in order to benefit the Bank on the Issuer Swap at the expense of the Issuer.

121.     Nor was the Issuer told about the steps Trader A took to carry out Rivoire's directive prior to the Pricing Call, including coordinating with the Broker before the Pricing Call about the Broker Screens, warning the Broker that Trader A would want to move the Broker Screens during the Pricing Call, and telling the Broker the difference between the spot and one-week forward prices that Trader A wanted to see on USDBASIS.

122.     The Issuer was likewise not told about the trading Trader A conducted on the morning of the Pricing Call and during the Pricing Call to move the Broker Screens down, nor that Rivoire directed Trader A when to begin trading during the Pricing Call to move the Broker Screens down.

123.     The Issuer was also not told about the extensive conversations Trader A had with the Broker during the Pricing Call to get the Broker to move the Broker Screens, including the one-week forward price on USDBASIS so that the one-week forward price would also reflect Trader A's manipulative trading.  Neither Rivoire nor Trader A, who both spoke to the Issuer during the Pricing Call, indicated in any way to the Issuer that Trader A was speaking to the Broker during the Pricing Call about moving the USDBASIS screen.

124.     During the Pricing Call, Rivoire made a number of statements to the Issuer and other participants about the Broker Screens and the prices displayed on the Broker Screens, including that there was a "latency issue" on the USDBASIS screen, that the "spot has already moved significantly since we priced," that "we're not going to be able to use the dry run number

in the sense that the spot has moved slightly but the spot has moved and we cannot ignore it," and "if you want to spot what we have on the screen now, which is 15.3 for the spot and 15 for the forward, that's fine for us." Under the circumstances, these statements were misleading in that Rivoire omitted to tell the Issuer or other participants the facts set out above, including his direction to Trader A to "push the screen," Trader A's trading, or Trader A's communications with the Broker before or during the Pricing Call.

125.    Further, Rivoire affirmatively represented to the Issuer on the Pricing Call that "Obviously we are not controlling the screen." Under the circumstances, this representation was false and misleading, in that at the time Rivoire made it he was aware that he had directed Trader A to "push the screen as much as we can before the pricing," that he had told Trader A to "just tell [the Broker] to mmove [sic]" the Broker Screens, that Trader A had traded to move the Broker Screens down during the Pricing Call, and that Trader A engaged extensively with the Broker after he traded to get the Broker to move the Broker Screens.

126.    These false and misleading statements were material to the Issuer. The Issuer would have wanted to know that individuals from the Bank were trading intentionally to move the Broker Screens to disadvantage the Issuer during the Pricing Call, because if the Issuer had known that information, the Issuer would have considered what steps it could take to prevent the resulting lower prices from being used to price the Issuer Swap.

127.    Because of these false and misleading statements, and because the Issuer was unaware of Rivoire and Trader A's conduct, the Issuer did not have the information necessary to allow it to make an informed decision about whether to proceed with its Bond Issuance and Issuer Swap or whether to take steps to prevent the lower prices that resulted from Rivoire and Trader A's conduct from being used to price the Issuer Swap.

128.    Like the Issuer, Rivoire's manipulative scheme was also deceptive to other market participants.  Other market participants were not aware that Rivoire had directed Trader A to push the screen at a particular time; that Trader A had coordinated with the Broker ahead of time to do so; and that Trader A engaged in manipulative trades which led to changes in the Broker Screens.  Further, other market participants were not aware that as a result of the manipulative scheme and Trader A's communications with the Broker, individuals at the Broker Firm or its affiliates moved the spot and one-week forward prices on the Broker Screens simply to satisfy Trader A's demands they move the Broker Screens, and not as a result of any market activity, in violation of the Broker Firm's policies, and that therefore the Broker Screens displayed spot and one-week forward prices for Five-Year Basis Swaps that were not a result of market conditions or actual market activity, but which were instead set by the manipulative activity of Rivoire and Trader A.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### Count I – Use of Manipulative or Deceptive Device

**Violations of Section 6(c)(1) of the Act,
7 U.S.C. § 9(1) (2018), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019)**

129.    The allegations set forth in paragraphs 1 through 128 are re-alleged and incorporated herein by reference.

130.    7 U.S.C. § 9(1) makes it unlawful "for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate."

131.    17 C.F.R. § 180.1(a) makes it "unlawful for any person, directly or indirectly, in connection with any swap . . . to intentionally or recklessly: (1) use or employ, or attempt to use

or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."

132.     Both the Issuer Swap with the Issuer and the Five-Year Basis Swaps traded by Trader A via the Broker Firm are swaps subject to the prohibitions of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

133.     As described above, in June and July 2012, Christophe Rivoire, in connection with the Issuer Swap and Five-Year Basis Swaps, directed Trader A to engage in a manipulative scheme to push the prices of Five-Year Basis Swaps down on the Broker Screens in order to benefit the Bank on the Issuer Swap to the detriment of the Issuer.

134.     By the foregoing conduct, Christophe Rivoire directly or indirectly used or employed or attempted to use or employ a manipulative device or contrivance or manipulative device, scheme, or artifice to defraud the Issuer and other market participants, and Rivoire engaged in such conduct intentionally or recklessly.

135.     By the foregoing conduct, Christophe Rivoire, directly or indirectly used or employed or attempted to use or employ a manipulative device or contrivance or made or attempted to make untrue or misleading statements of material fact to the Issuer or omitted to state material facts necessary in order to make his statements to the Issuer not untrue or misleading, and Rivoire engaged in such conduct intentionally or recklessly.

136.     By the foregoing conduct, Christophe Rivoire directly or indirectly used or employed or attempted to use or employ a manipulative device or contrivance or engaged or

attempted to engage in an act, practice, or course of business which operated or would operate as a fraud or deceit on the Issuer and other market participants, and Rivoire engaged in such conduct intentionally or recklessly.

137.    Each and every overt action in furtherance of the use or attempted use of a manipulative or deceptive device or contrivance is alleged herein as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

## Count II – Control Person Liability

**Violations of Section 6(c)(1) and 13(b) of the Act,
7 U.S.C. § 9(1), 13c(b) (2018), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019)**

138.    The allegations set forth in paragraphs 1 through 137 are re-alleged and incorporated herein by reference.

139.    Trader A violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) by his conduct described above.

140.    Christophe Rivoire, as the Head of North American Rates, oversaw the Bank's interest rates business in North America, including Trader A's desk, and controlled Trader A directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts of Trader A to carry out the manipulative scheme to defraud set forth above.

141.    Therefore, pursuant to 7 U.S.C. § 13c(b), Rivoire is liable as a controlling person for the violations of Trader A of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

## Count III – Aiding and Abetting Liability

**Violations of Section 6(c)(1) and 13(a) of the Act,
7 U.S.C. § 9(1), 13c(a) (2018), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019)**

142.    The allegations set forth in paragraphs 1 through 141 are re-alleged and incorporated herein by reference.

143.    Trader A violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a) by his conduct described above.

144.    Christophe Rivoire directed, commanded, and induced Trader A to carry out the manipulative scheme to defraud set forth above and he procured Trader A's conduct that constituted the scheme and sought by his actions to make the scheme succeed.  Accordingly, pursuant to 7 U.S.C. § 13c(a) he is also liable for aiding and abetting Trader A's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a).

## VI.    RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers, enter:

A.    An order finding that Christophe Rivoire violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019).

B.    An order of permanent injunction enjoining Rivoire and any of his officers, agents, servants, employees, assigns, or attorneys, and all persons in active concert or participation with him, who receive actual notice of such order by personal service or otherwise, from:

i.    Engaging, directly or indirectly, in conduct in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a);

ii.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

iii.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019)), for

his own personal account or for any account in which Rivoire has a direct or indirect interest;

iv.    Having any commodity interests traded on Rivoire's behalf;

v.     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

vi.    Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

vii.   Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019); and/or

viii.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration, or required to be registered with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9).

C.  An order requiring Rivoire to pay civil monetary penalties, plus post-judgment interest thereon, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74, tit. VII,

§ 701, 129 Stat. 584, 599, *see* 17 C.F.R. § 143.8 (2019), for each violation of the Act and Regulations described herein;

D.  An order directing Rivoire to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, fees, or loans derived directly or indirectly from acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

E.  An order directing Rivoire to make full restitution, pursuant to such procedure as the Court may order, to the Issuer in the amount the Issuer was harmed as a result of the acts and practices constituting violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

F.  An order requiring Rivoire to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

G.  An order providing such other and further relief as the Court deems proper.

*       *       *

## VII.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated:  December 20, 2019

COMMODITY FUTURES TRADING
    COMMISSION

Manal M. Sultan
Deputy Director
Commodity Futures Trading Commission
Division of Enforcement

By: /s/ Gabriella Geanuleas
Gabriella Geanuleas
Candice Aloisi
Stephen Painter (*pro hac vice* admission
application to be filed)
James Wheaton

Commodity Futures Trading Commission
Division of Enforcement
140 Broadway, 19th Floor
New York, NY 10005
Phone: (646) 746-9887
Fax: (646) 746-9939
ggeanuleas@cftc.gov

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
    COMMISSION