**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | No. 19-cv-11701 (JHR) |
| Plaintiff, | |
| v. | |
| CHRISTOPHE RIVOIRE, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF DEFENSE EXPERT ALAN MITTLEMAN**

James G. Wheaton
Devin Cain
Benjamin Rankin
R. Stephen Painter, Jr.
Commodity Futures Trading Commission
Division of Enforcement
290 Broadway, 6th Floor
New York, NY 10007
Phone: 646-746-9700
jwheaton@cftc.gov

May 12, 2023

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

LEGAL STANDARD ......................................................................................................... 2

ARGUMENT ..................................................................................................................... 4

I.  Mittleman's Report and Testimony Should Be Excluded as Impermissible Factual
Narrative ........................................................................................................................ 5

    A. Mittleman's Narrative of the 2012 JBIC Transaction and Trading Should
    Be Excluded ............................................................................................................. 6

    B. Mittleman's Narrative of Purported "ICAP Screen Issues" Should Be
    Excluded .................................................................................................................. 7

    C. Mittleman's Narrative of "Communications and Activity Involving HSBC
    Trader Morgan Najar" Should Be Excluded ....................................................... 8

    D. Mittleman's Narrative of "Communications and Activity Involving
    Rivoire" Should Be Excluded .............................................................................. 10

II. Mittleman Improperly Opines as to the State of Mind of Rivoire and Non-Parties ............... 12

    A. Mittleman Improperly Opines as to Rivoire's State of Mind ........................... 13

    B. Mittleman Improperly Opines as to the State of Mind of Non-Parties,
    Including Najar and O'Reilly .............................................................................. 15

III.    Mittleman's Opinion Contains Impermissible Legal Conclusions ................................ 17

IV.    Mittleman's Testimony Regarding Economics Should be Excluded Because
He Is Not Qualified to Testify on Economics ......................................................... 20

V. Mittleman Did Not Design, Operate or Manage Broker Screens and Is Not
Qualified to Testify as to their Operations ............................................................... 23

CONCLUSION ................................................................................................................. 24

# TABLE OF AUTHORITIES

## Cases

*AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411 (GHW)(SN), 2019 WL
    1254763 (S.D.N.Y. Mar. 19, 2019), objections overruled, No. 1:15-CV-3411-
    GHW, 2019 WL 2992016 (S.D.N.Y. July 8, 2019)...................................................... 12

*CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233 (S.D.N.Y. 2012) ........................................... 22

*Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993)........................................................... 2

*FTC v. Vyera Pharms., LLC,* No. 20cv00706 (DLC), 2021 WL 5336949
    (S.D.N.Y. Nov. 16, 2021) ..................................................................................................... 11

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .............................................................................. 23

*Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008).............. 4, 12, 17

*Highland Cap. Mgmt., L.P. v. Schneider,*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005)........................ 6

*In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61 (S.D.N.Y. 2001) .................................. 3

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F.Supp.3d 430
    (S.D.N.Y. 2018) ......................................................................................................................... 3

*In re Mirena IUD Prods. Liab. Litig*., 169 F. Supp. 3d 396 (S.D.N.Y. 2016) ............................... 3

*In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ......................... 3, 6, 8

*Kewazinga Corp. v. Microsoft Corp.*, No. 1:18-CV-4500-GHW, 2021 WL
    4066597 (S.D.N.Y. Sept. 1, 2021)..................................................................................... 12

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.,* 14 F. Supp. 2d 391
    (S.D.N.Y. 1998) ....................................................................................................................... 15

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................................................... 3

*LinkCo, Inc. v. Fujitsu Ltd*., 00 Civ. 7242 (SAS), 2002 WL 1585551 (S.D.N.Y.
    July 16, 2002)............................................................................................................................ 6

*Luizzi v. Pro Transp., Inc*., No. 02 CV 5388 (CLP), 2011 WL 1655567 (E.D.N.Y.
    May 2, 2011).......................................................................................................................... 20

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ....................................................... 3, 20

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017)............................................................... 2, 22

*SEC v. Badian*, 822 F. Supp. 2d 352 (S.D.N.Y. 2011) ............................................................ 3, 14

*SEC v. Mudd*, No. 11 CIV. 9202 (PAC), 2016 WL 2593980 (S.D.N.Y. May 4, 2016) ............................................................................................................ 3, 5, 17

*SEC v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) ............................................. 6, 19

*Set Cap., LLC v. Credit Suisse Grp., AG*, 996 F.3d 64 (2d Cir. 2021) ........................ 22

*SLSJ, LLC v. Kleban,* 277 F. Supp. 3d 258 (D. Conn. 2017) ...................................... 11

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ............................................ 17

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988), *rev'd in part on reh'g on other grounds*, 856 F.2d 5 (2d Cir. 1988) ................................................................. 18

*United States v. Tin Yat Chin*, 371 F.3d 40 (2d Cir. 2004) .......................................... 20

*Washington v. Kellwood Co.*, 105 F.Supp.3d 293 (S.D.N.Y. 2015) ........................... 20

**Rules**

Fed. R. Evid. 403 ....................................................................................................... 3, 10

Fed. R. Evid. 702 ......................................................................................................... 2, 9

Plaintiff Commodity Futures Trading Commission ("CFTC" or the "Commission") respectfully submits this Motion to Exclude the Report and Testimony of Defense Expert Alan Mittleman.

## PRELIMINARY STATEMENT

Rather than presenting a reliable opinion based on specialized knowledge that would assist a trier of fact, Defendant Christophe Rivoire ("Rivoire") has instead offered a 128-page narrative description—replete with a two-page, nine-part "summary of opinions"—crammed with conclusions on virtually every factual and legal aspect of this case. This transparent effort to interject second-hand factual argumentation and legal conclusions under the guise of an "expert" opinion is wholly inadmissible for multiple reasons.

*First*, the Report[1] is not expert testimony but rather an extensive factual narrative full of selected record evidence, the defense interpretation of select record evidence on lay matters, and conclusions about factual matters. Factual argumentation based on record evidence is not appropriate for expert testimony.

*Second*, the Report repeatedly opines as to key individuals' state of mind—for example stating that certain conversations should be interpreted as "joking commentary" or that Rivoire's directions to others evinced no malign intent. These are jury questions and inadmissible.

*Third,* the Report offers both explicit and implicit legal conclusions, most blatantly in opining as to the ultimate questions in this case regarding manipulation and false statements and offering disguised conclusions as to ultimate questions in opining that Rivoire's communications and the trading here were "reasonable," appropriate, or consistent with market practices. These

---

[1] The Expert Report of Alan Mittleman ("Report") is attached as Exhibit 1 to the Declaration of Trevor Kokal in Support of Plaintiff Commodity Futures Trading Commission's Motion to Exclude ("Declaration" or "Decl.").

are explicit and disguised legal conclusions that usurp the role of the jury and could cause confusion, and are thus inadmissible.

*Fourth*, the Report's conclusions regarding economics are inadmissible. Mittleman is not an economist, did not cite economic literature, expressly disclaimed being an economics expert, and came to conclusions regarding "supply and demand" that are without a reliable methodology and that are thus inadmissible.

*Fifth*, Mittleman's opinions as to the operations of broker screens—which he never worked on, designed or managed—is an area about which he is not qualified to opine and should thus be excluded.

## LEGAL STANDARD

Under Federal Rule of Evidence 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 requires "more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). Under *Daubert*, a court functions as a "gatekeeper" that reviews the reliability and relevance of an expert's technical, specialized knowledge. *Restivo v. Hessemann*, 846 F.3d 547, 575–76 (2d Cir. 2017). And a court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Although the *Daubert* analysis was initially developed to examine scientific testimony, it applies with equal force to other types of expert testimony,

including testimony from economists. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact. *See Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005).

"In addition to the requirements of Rule 702, expert testimony is subject to Rule 403 . . . ." *Nimely*, 414 F.3d at 397. Even if an expert is qualified, his or her testimony may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also Nimely*, 414 F.3d at 397 (noting the "uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony").

There are several bright lines that expert opinions cannot cross. An expert witness "cannot simply present his version of the facts in the guise of an expert opinion." *SEC v. Mudd*, No. 11 CIV. 9202 (PAC), 2016 WL 2593980, at *4 (S.D.N.Y. May 4, 2016). "As a general rule an expert's testimony on issues of law is inadmissible." *SEC v. Badian*, 822 F. Supp. 352, 357 (S.D.N.Y. 2011) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)); *see also, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (prohibition on experts offering legal opinions is an "axiomatic principle" (quotation omitted)). Experts may not "usurp . . . the role of the jury in applying [the] law to the facts before it," or "tell the jury what result to reach." *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (citations and quotations omitted). And "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *Id*. at 547; *see also, e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 479 (S.D.N.Y. 2016) (excluding opinions

3

that "impermissibly speculate on [company's] or [regulator's] state of mind or intent"); *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 182 (S.D.N.Y. 2008) ("*Highland I*") ("Opining about a party's state of mind . . . is impermissible.").

## ARGUMENT

As set forth below, the Court should exclude the Report and associated testimony because it is impermissible factual narrative, purports to offer opinion as to the state of mind of Rivoire and others, offers unqualified opinion without a reliable methodology, and offers opinion that will confuse the jury. To assist the Court, we summarize the bases for exclusion as to Mittleman's principle opinions:

| Principal Opinion | Description | Report Paragraph Numbers | Reasons for Exclusion and Motion to Exclude Discussion |
|---|---|---|---|
| A | " . . . HSBC's trading with respect to the duration, swap spread, and basis risk associated with the JBIC issuer swap was ***reasonable, proportional, and consistent with good market practice***." | 12(a), 68-98 | Impermissible factual narrative (pp. 5-7); impermissible legal conclusions (pp. 17-20). |
| B | Transactions "***were executed at market prices that were determined by, and that reflected, the normal market forces of supply and demand***." Further, HSBC "***did not cause or transact at any artificial prices.***" | 12(b), 98, 122, 147, 151, 166, 226-239 | Not an economist (pp. 20-23); no reliable principles or methodology was employed (pp. 21-23). |
| C | "Rivoire did not improperly conceal HSBC's hedging activity from JBIC, nor did he …. ***mislead JBIC or misrepresent any material facts,***" and JBIC would have understood HSBC's trading activity. | 12(c), 64-65, 169, 186-192, 224-225 | Impermissible factual narrative (pp. 6-7, 10-11); impermissible opinion about state of mind (pp. 12-17); impermissible legal conclusions (pp. 17-20). |
| D | Broker screens "were beset by technical issues before and during the pricing call" caused "solely by ICAP personnel." | 12(d), 99-120, 186-192 | Not an expert on screens (p. 23); impermissible factual narrative (pp. 7-8). |
| E | Nothing in Najar's conversations with ICAP broker McDonnell " ***was indicative of misconduct.*** These communications reflected normal interactions between a trader and his broker…." | 12(e), 134-156 | Impermissible factual narrative (pp. 8-10); impermissible opinion about state of mind (pp. 15-16); impermissible legal conclusions (pp. 17-20). |

| F | Najar's communications with James O'Reilly are "immature, joking commentary between two relatively junior work colleagues" and "***not evidence of misconduc***t" or a "'prediction' on the success of the alleged "manipulative scheme.'" | 12(f), 157-168 | Inadmissible factual narrative (pp. 8-10); impermissible opinion about state of mind (pp. 15-17); impermissible legal conclusions (pp. 17-20). |
| G | Rivoire's communications with senior HSBC personnel were "***reasonable and consistent with normal practice for a senior manager of a rates trading business***…." | 12(g), 169-192 | Inadmissible factual narrative (pp. 10-11); impermissible opinion about state of mind (pp. 12-15); impermissible legal conclusions (pp. 17-20). |
| H | Rivoire's communications related to trades near the transaction were appropriate and "***none of Rivoire's communications suggested or encouraged fraud, market manipulation, or other improper activity.***" | 12(h), 169-192 | Inadmissible factual narrative (pp. 10-11); impermissible opinion about state of mind (pp. 12-15); impermissible legal conclusions (pp. 17-20). |
| I | "There was nothing inappropriate in Rivoire joining the pricing call and managing the latter part of the call . . . ." | 12(i), 186-192 | Inadmissible factual narrative (pp. 10-11); impermissible legal conclusions (pp. 17-20). |

## I.    Mittleman's Report and Testimony Should Be Excluded as Impermissible Factual Narrative

Mittleman's Report (and concomitant testimony) is inadmissible in its entirety because it is largely and primarily a factual narrative. Mittleman's Report presents a running commentary on documents and testimony in the case that is almost universally based on neither personal knowledge nor specialized knowledge and for that reason should be excluded.

It is well-settled that an expert witness "cannot simply present his version of the facts in the guise of an expert opinion." *Mudd*, 2016 WL 2593980, at *4. This makes sound sense: an expert's role is to provide specialized knowledge and insight into discrete technical subjects, not to present second-hand factual information in an attorney-curated fashion. "Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology. Mere narration thus fails to

5

fulfill *Daubert's* most basic requirements." *SEC v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) ("It is . . . inappropriate for experts to become a vehicle for factual narration."); *Highland Cap. Mgmt. v. Schneider*, 379 F. Supp. 2d 461, 468–69 (S.D.N.Y. 2005) ("*Highland II*") ("To the extent that [the Expert] is simply rehashing otherwise admissible evidence about which he has no personal knowledge, such evidence—taken on its own—is inadmissible."); *LinkCo, Inc. v. Fujitsu Ltd.*, 00 Civ. 7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (excluding report that "does no more than counsel . . . will do in argument, i.e., propound a particular interpretation of [party's conduct]") (quotations omitted). Factual narratives are impermissible because experts have "ha[ve] no personal knowledge," such narration is not traceable to a reliable methodology, and the interpretation and examination of record evidence are "lay matters which a jury is capable of understanding." *Highland II,* 379 F. Supp. 2d at 469 (quotations omitted); *see LinkCo, Inc.,* 2002 WL 1585551, at *2.

Mittleman's Report is precisely the kind of prohibited narrative that should instead be "presented through percipient witnesses and documentary evidence." *Rezulin*, 309 F. Supp. 2d at 551.

### A.  Mittleman's Narrative of the 2012 JBIC Transaction and Trading Should Be Excluded

Section VI of the Report, "Specifics of the 2012 JBIC Transaction," briefly summarizes the elements of the transaction and the purported risk to HSBC from the transaction. (Report ¶¶ 68-88.) The Report then summarizes—with four distinct Report Exhibits (i.e., Exhibits 11-14)— a purported chronological "Overview of JBIC Pricing Call: July 11, 2012: 11:28 a.m. – 12:00 p.m." (*id.* ¶ 85), a summary of events during the "JBIC Pricing Call: July 11, 2012: 11:35 a.m. – 11:42 a.m." (*id.* ¶ 86), select snippets of record conversations during the "JBIC Pricing Call: July 11, 2012: 11:40 a.m. – 11:54 a.m." (*id.* ¶ 87), and events during the "JBIC Pricing Call: July 11,

6

2012: 11:53 a.m. – 11:58 a.m." (*id.* ¶ 88), all summarizing record conversations, communications, and/or events. In addition, Sections VI.2-4 (*id.* ¶¶ 89-93) summarize record evidence regarding the timing and size of trading in three markets (treasuries, basis swaps, interest rate swaps). These sections of the Report do nothing other than summarize record evidence in narrative form and should be excluded as pure factual narrative.

### B.  Mittleman's Narrative of Purported "ICAP Screen Issues" Should Be Excluded

Section VII of the Report, "Analysis of ICAP Screen Issues Leading Up To And During The Pricing Call" is similarly a detailed summary of record evidence relating to the operation of ICAP screens in general and on the day in question. Take the discussion of the "Geographic control" of the 19905 screen (*id.* ¶¶ 103-11): the discussion is simply a chronologically organized description of selected conversations and communications. Section VII.C of the Report, i.e., "ICAP Screen Issues During the 2012 JBIC Transaction" (*id.* ¶¶ 112-20) provides an almost minute-by-minute description of screen levels and witness communications, at times taking the form of a pure factual narrative.  By way of example, Mittleman states:

> After Watson communicated to Nicholls that the 1-week forward price was not responding to New York's inputs, Nicholls reached out to Taplin around 11:46 a.m. . . . and Taplin ***discovered his error.***[2] Taplin then explained to Nicholls that it was ICAP London, not ICAP New York, that had control over the 1-week forward price on the USDBASIS screen, and if ICAP London adjusted the prices in its ISIS system, the 1-week forward price on the screen should move accordingly. At around 11:48 a.m., Hayes communicated this same information to Watson . . . .

*Id.* ¶ 116 (emphasis added).

---

[2] While Mittleman's Report is presented as a factual narrative, it is far from even-handed. For example, while Mittleman characterizes Taplin's state of mind as "discovering his error," the materials cited by Mittleman do not reference the discovery of *any* error, let alone an error *by Taplin*. The cited materials—an audio transcript, Decl. Ex. 2 and excerpts of Mr. Taplin's deposition, Decl. Ex. 3—discuss the operation of a technical process, but they do not address whether or not that process involved an error. Mittleman does not explain the basis for his conclusion or claim any particular expertise—rather, this is pure factual argumentation more properly made by a lawyer.

Detailed factual information is properly presented not by a purported expert but rather by percipient witnesses or documents. *See Rezulin*, 309 F.Supp.2d at 551 (rejecting portions of plaintiffs' expert's testimony that was "a narrative reciting selected regulatory events" because "[s]uch material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence.."). Here Mittleman has no first-hand or personal knowledge about the factual information that he cites.

### C. Mittleman's Narrative of "Communications and Activity Involving HSBC Trader Morgan Najar" Should Be Excluded

The next section of the Report, and indeed the heart of the Report (Section VIII, "Analysis of Communications and Activity Involving HSBC Trader Morgan Najar"), is over thirty pages of advocacy set in a factual narrative. The section has three subsections, each detailing a portion of record evidence in this case: the "July 5, 2012 'Push the Screen' Email" (Report ¶¶ 123-33), "Communications with ICAP Broker Michael McDonnell" (*id.* ¶¶ 134-56), and "Najar's Communications with James O'Reilly" (*id.* ¶¶ 157-68). Each section is dominated by factual narrative, and in the case of the communications with O'Reilly and McDonnell, Mittleman often describes the communications and actions minute-by-minute. *See, e.g. id.* ¶ 145 ("At 10:21 a.m. Najar again checked in with McDonnell to see if the broker had found any bids . . . A few minutes later, at 10:24 a.m. Najar found the market and his offer in 5-year 6s3s got lifted at 15.25 basis point"); *id.* ¶ 149 ("At 11:08 a.m. Najar confirmed with McDonnell that the market for 5 year 6s3s was still 15.375 bid-15.50 offer and told McDonnell 'I'm gonna come back to you shortly . . . don't go anywhere.' At 11:17 a.m. Najar asked McDonnell why the 19905 screen was showing 115.50 basis points, even though the last trade had occurred at 15.375 basis points.").

The Report interrupts its largely chronological narrative to insert Mittleman's purported interpretations of the communications or events. But these interpretations are not based on Mittleman's "scientific, technical or other specialized knowledge" as required by Rule 702(a), and are therefore inadmissible. Take Mittleman's interpretation of one of the central pieces of evidence in this case, Rivoire's instruction to Najar to "push the screen as much as we can." (*Id.* ¶ 124.) The phrase is written in plain, non-technical language and is of the sort readily interpreted by jurors. Mittleman takes that term and simply adds lawyerly elaboration. Mittleman contends that "when read in context," "push the screen" was actually "a concise way of communicating 'Make sure the screen is in alignment with the market given current market and liquidity conditions, and if it not, make sure it gets there.'" (*Id.* ¶ 125.) But Mittleman does not ground his interpretation in any specialized knowledge or methodology. While he claims that it is common for people in the industry to use shorthand and jargon, (*id.* ¶ 125), he does not even opine that this language is consistent with some known industry term of art. Rather, he states that "when the full context is considered, Rivoire's email should be understood, in my opinion, as normal and appropriate guidance . . . ," (*Id.* ¶ 124.) And Mittleman cites to the deposition testimony[3] in the case, advancing one witness's after-the-fact interpretation of what "push the screen" meant. This is precisely the kind of non-expert factual interpretation that invades the province of the jury and should be excluded. Additionally, because of Mittleman's expert status,

---

[3] Mittleman cites the testimony of another trader, Joseph Mosca, to support his interpretation of Rivoire's email. While Mosca testified that he did not have any recollection whatsoever of the transaction (Mosca Tr. 178:8-20, Decl. Ex. 4), Mittleman quotes Mosca's testimony for, among other things, the proposition that English was Rivoire's second language and that Rivoire was using "not his best English" when he instructed Najar to push the screens. (Report ¶ 125.) Mittleman did not disclose in his Report—but admitted at his deposition—that he met Rivoire, having interviewed with Rivoire for a job in 2010 or 2011, and that Rivoire's non-native English did not present difficulties for Mittleman in understanding what Rivoire was conveying about fixed income markets. (Mittleman Dep. 20:13- 22:6, Decl. Ex. 5.)

there is the risk that jurors would place undue emphasis on his interpretation of record evidence. The testimony should thus be excluded under Fed. R. Evid. 403 as well.

Similarly, Mittleman's 20-page narrative of Najar's communications with HSBC's broker, Michael McDonnell, both before and during the pricing call, is entirely factual narrative interspersed with purported opinions that the conversations were neither unusual nor indicative of misconduct. (*Id.* ¶¶ 134-56). Mittleman's basis for whether the conversations were unusual or indicative of misconduct is based on his supposed personal practice, for example, opining that "I have found it prudent to give brokers advanced notice of a potential deal pricing." (*Id.* ¶ 138.) And while Mittleman states that "[o]verall, in my view, the communications between Najar and McDonnell prior to July 11, 2012 [i.e., the day of the Pricing Call] were not unusual or outside the norm of market conventions," (*id*. ¶ 138), he provides no basis at all for that assertion other than his own anecdotal purported personal practice. Mittleman's description of Najar and McDonnell's communications and his "because I said so" interpretation that the communications were reasonable offers nothing that would help a trier of fact understand the evidence or determine a fact in issue.

### D.  Mittleman's Narrative of "Communications and Activity Involving Rivoire" Should Be Excluded

Section IX of the Report, "Analysis of Communications and Activity Involving Rivoire" (*id.* ¶¶ 169-92), is likewise a lengthy factual narrative replete with intermittent and conclusory interpretative asides. One example is the Report's lengthy exegesis of "Internal Communications related to Mispricing of Issuer Swap," (*id.* ¶¶ 170-80), which purports to draw various factual conclusions from Mittleman's purported review of documents:

> With respect to the mispricing issue, a review of internal HSBC discussions surrounding the JBIC deal—from JBIC's first request for proposal ("RFP") in early May 2012 to the days leading up to actual deal pricing in July 2012—demonstrates that Rivoire's

10

> frustration with the pricing of the deal stemmed from unclear communication and wrong
> assumptions by HSBC's Tokyo DCM team.

(*Id.*¶ 171.) This section of the Report is replete with description and conclusions from record
evidence. *Id.* ¶ 175 ("there seemed to be a miscommunication within the Tokyo DCM team….");
*id.* ¶ 176 ("Unknown to Rivoire and as explained in a later email, the Tokyo DCM team had
assumed there would be no premium added…"); *id.* ¶ 177 ("HSBC senior-level employees
wanted to salvage and repair the relationship with JBIC . . ."). The discussion culminates in a
factual conclusion: "The evolution of Rivoire's exchanges with the DCM illustrates that his
frustrations around the pricing of the JBIC deal were justified, given the mistakes made on the
part of the Tokyo DCM team." (*Id.* ¶ 179.)

Mittleman does not draw on any specialized knowledge; nor does he explain why any
specialized knowledge is even needed. Instead, throughout, Mittleman simply, and improperly,
argues from facts. *See FTC v. Vyera Pharms., LLC,* No. 20cv00706 (DLC), 2021 WL 5336949,
at *6 (S.D.N.Y. Nov. 16, 2021) (excluding majority of expert report where the expert "merely
recount[ed] facts in support of his views on matters beyond his expertise, or in support of an
argument more appropriately made by counsel"); *SLSJ, LLC v. Kleban,* 277 F. Supp. 3d 258, 280
(D. Conn. 2017) (an "expert may not simply recite a factual narrative from one party's
perspective, granting it credibility, when he has no personal knowledge of the facts addressed.").
Like the rest of Mittleman's narrative commentary and factual argumentation, the Court should
exclude Mittleman's discussion of the section "Communications and Activities Involving
Rivoire."

## II.    Mittleman Improperly Opines as to the State of Mind of Rivoire and Non-Parties

Interlaced throughout the Report are various conclusions about the state of mind of Rivoire and non-parties. These include, importantly, conclusions that Najar's communications with a colleague on the swaps desk, James O'Reilly, "***should be understood*** as immature, joking commentary" (Report ¶ 12.f) (emphasis added), that "none of Rivoire's communications suggested or encouraged fraud, market manipulation, or other improper activity" (*id.* ¶ 12.h) and that Rivoire's words "***should be understood***" as appropriate and not intended to convey illicit instructions (*id.* ¶ 124.)

But the law regarding expert opinions is simple and clear: "Expert opinions about beliefs, intents, or motives are inadmissible." *Kewazinga Corp. v. Microsoft Corp.*, No. 1:18-CV-4500-GHW, 2021 WL 4066597, at *15 (S.D.N.Y. Sept. 1, 2021). As one court in this district put it: "Because science has not yet invented a way to read minds, 'inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.'" *AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411 (GHW) (SN), 2019 WL 1254763, at *13 (S.D.N.Y. Mar. 19, 2019), *objections overruled*, No. 15-CV-3411 (GHW) (SN), 2019 WL 2992016 (S.D.N.Y. July 8, 2019) (quoting *Rezulin*, 309 F. Supp. 2d at 546). Because "juries must answer questions of intent with the lay tools that they always have: examination of testimony and documents, and assessment of credibility," expert testimony as to intent is "completely unnecessary, potentially misleading, and therefore inadmissible." *Id.*; *see Highland II*, 379 F. Supp. 2d at 469 (excluding expert testimony "as to the state of mind and knowledge possessed by defendants and non-parties").

### A.  Mittleman Improperly Opines as to Rivoire's State of Mind

As noted above, Mittleman offers his opinion regarding what Rivoire intended when he instructed Najar to "push the screen as much as we can before the pricing." Mittleman states that it is "incorrect" to construe that email as evidence of an intent to manipulate prices. (Report ¶ 124). Rather, Mittleman offers his own view of Rivoire's state of mind: Rivoire was instructing Najar to "[m]ake sure the screen is in alignment with the market given current market and liquidity conditions, and if it is not, make sure it gets there." (*Id.* ¶ 125). This is pure conjecture as to Defendant's intent and thus inadmissible.

Mittleman also offers opinions as to Rivoire's state of mind when Rivoire discussed "push[ing] the market" and "push[ing] spreads" with another HSBC trader, Stephen Tsang. Mittleman credits the testimony of Tsang (notwithstanding Tsang's testimony that he actually had no recollection of the conversation) that Rivoire's reference to "push[ing]" markets "was about being an active participant in the market and the impacts of liquidity on market price." (Report ¶ 182).

But Mittleman does not mention Rivoire's reference, in his conversation with Tsang, about the possibility of making money by "push[ing] the market . . . a tick or whatever", i.e., that "***immediately it's 300 or 400k you can make***." (*Id.* ¶ 182 (omitting bolded text); Dep. Ex. 147-T, Decl. Ex. 6, pp. 2-3). Nor does Mittleman refer to Tsang's testimony in which Tsang interpreted "push the market" as referring to "some sort of potential or an optimistic way of thinking about trading in the market, that can result in P&L."[4] (Tsang Dep. 106:2-14, Decl. Ex. 7.) Similarly,

---

[4] Curiously, Tsang's interpretation of "push the market" is inconsistent with Mittleman's own personal understanding of that phrase. Mittleman claimed in his deposition that he understood "pushing the market" to mean the same as "pushing the screen" (i.e., in Mittleman's apparent view, they both mean trying to get screen levels to

Mittleman does not quote the related discussion surrounding Rivoire's statement to Tsang about "pushing the spreads," i.e., that Rivoire uttered those words in response to Tsang's question "***Can we make any money on the swap?***"—to which Rivoire responded: "***Ah, if we are lucky we can as well, huh?*** If we can push the, the spreads quarter or a basis point or whatever." (Report ¶ 183 (omitting bolded text); Dep. Ex. 147-T, Decl. Ex. 6, p. 6). Mittleman's selective reliance on materials in the record to support his inference as to Rivoire's intent (and sidelining of materials at odds with that interpretation) highlight exactly why state of mind is not appropriately the province of an expert opinion.

The Report draws numerous other conclusions as to Rivoire's state of mind: concluding that none of Rivoire's communications suggested or encouraged fraud, market manipulation, or other improper activities (Report ¶ (12(h)); that "Rivoire's communications *do not* reflect any suggestion that Najar should engage in market manipulation, fraud or other misconduct . . . Rivoire's communications are consistent with normal and appropriate guidance for a senior rates manager to give a junior basis trader . . ." (*id.* ¶ 121) (emphasis in original); and opining that Rivoire's statement that "we need to drive the execution process to minimize the losses" did not refer to manipulation and was only "intended to seek a smooth execution," (*id.* ¶ 184).

*SEC v. Badian* is instructive. There, the court excluded an expert's opinion that consisted in significant part of statements about "the meaning of non-technical words and phrases as used by [Defendant] during recorded telephone conversations, including the words and phrases 'clobber,' 'collapsed' and 'unbridled level of aggression.'" *SEC v. Badian*, 822 F. Supp. 2d 352,

---

accurately reflect market levels). (Mittleman Dep. 271:3-272:3, Decl. Ex. 5.) Notably, Mittleman's understanding is also at variance with Rivoire's understanding of those terms, which is that "push the screen" means take steps to make sure that the screen reflected market levels, but that "push the market" means that the volume of trades might "push or move the market." (Rivoire Dep. 239:13-240:15, Decl. Ex. 8.)

358 (S.D.N.Y. 2011) (noting that the expert was "not qualified to testify as to what was in the defendant's mind when he used those words . . .").

So too here: a jury does not benefit from a purported expert explaining what "push" means any more than the *Badian* jury would have benefited from an opinion as to the intent behind the terms "clobber" or "collapsed." Mittleman's opinions as to Rivoire's state of mind should thus be excluded. Indeed, testimony of the sort offered by Mittleman as to Rivoire's intent, i.e., factual conclusions about state of mind, have been singled out as improper for expert testimony. *See Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.,* 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998) ("[J]uries traditionally decide whether an individual acted knowingly, or willfully, or maliciously, or with specific intent, or with any other relevant state of mind.").

### B. Mittleman Improperly Opines as to the State of Mind of Non-Parties, Including Najar and O'Reilly

In addition to opining as to the state of mind of Rivoire, Mittleman offers myriad conclusions as to the state of mind of non-parties. Indeed, one of the Report's nine principal conclusions is an explicit finding that readers should infer joviality and not any evidence of misconduct from record evidence:

> Najar's communications with HSBC employee, James O'Reilly ("O'Reilly"), should be understood as immature, joking commentary between two relatively junior work colleagues on a trading desk, not, as Plaintiff asserts, as evidence of misconduct by Rivoire or a "prediction" on the success of the alleged "manipulative scheme."

(Report ¶ 12(f).)

The Report's purported support for this conclusion is a seven-page review of the communications between the two and some of the related deposition testimony. For example the Report concludes that Najar's statement "im going to sell the crap out of it" was, based on Najar's testimony, "not a reference to market manipulation or other wrongful conduct,"

(*id.* ¶ 159), but completely ignores Najar's testimony that he meant "I have to sell beforehand to move the screen." (Najar Dep. 99:8-9, Decl. Ex. 9).[5] Likewise, the Report emphasizes that Najar described one comment by Najar ("CR [Rivoire] said to push it to 13 llol"), as a joke, (Report ¶ 163), and describes Najar and O'Reilly's communications as "banter about how prices in the market will shake out," (Report ¶ 163), but omits Najar's testimony that he had thought that moving the price level to 14.5 (which he discussed with O'Reilly) was "possible," (Najar 176:16-18, Decl. Ex. 9), and also omits Najar's testimony that his entire exchange with O'Reilly about pushing the screen down, while containing some sarcasm, was consistent with Rivoire's instruction to "push the screen," (Najar 175:10-14, Decl. Ex. 9.)

Likewise, the Report repeats its claim that the communications between Najar and O'Reilly were mere jokes or banter multiple times: Report ¶ 164 (states that neither O'Reilly nor Najar had any substance to back up their joking exchange.); *id.* ¶ 166 ("I do not find anything nefarious in the trading activity that would indicate these exchanges are anything other than banter between workplace friends."); *id.* ¶ 168 ("it makes sense to read Najar's statement 'I really pushed it down' as a joke rather than a serious reflection of misconduct"). Each of these references to Najar's and O'Reilly's states of mind, and any other testimony to that effect, is inadmissible.

The Report also draws conclusions as to JBIC's state of mind. The Report states as a principal conclusion that a market participant "such as JBIC **would be expected to understand**

---

[5] The Report emphasizes Najar's testimony that Najar was not telling O'Reilly that Najar was going to engage in market manipulation. *See* Report ¶ 159 ("Najar . . . testified that this comment had to do with making sure the ICAP screens worked properly and were reflecting accurate market prices, and not as a reference to market manipulation of other wrongful conduct."). But the Report does not fairly capture Najar's testimony. Najar testified that he did not think he was doing anything wrong, in part, because: "I felt that my boss's boss was telling me to do something, my boss Joe Mosca is copied on it, that I did not think at the time it was improper. I didn't think they would ask me to do something that was improper." (Najar Tran. 386:20-387:10, Decl. Ex. 10.)

16

that a swap dealer such as HSBC would actively trade in the market before, during, and after the pricing of an issuer swap," (*id.* ¶ 12(c)); that "[a]ny participant in an interest rate swap transaction **would be expected to know**" that trading takes place during large deals, (*id.* ¶ 64), and that JBIC would be "**expected to know** that dealers actively trade in markets before during and after issuer pricings," (*id.* ¶ 65). But Mittleman does not explain *why* a party like JBIC would "be expected to know" such information, what precisely would be the scope of that expected knowledge, the source of such an expectation or the basis of Mittleman's assertions regarding that expectation.[6] This testimony should likewise be excluded.

### III.    Mittleman's Opinion Contains Impermissible Legal Conclusions

It is axiomatic that "although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *accord Highland II*, 379 F. Supp. 2d at 470 (""[I]t is axiomatic that an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms[.]"") (quoting *Roundout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F.Supp.2d 469, 480 (N.D.N.Y.2004)).

The Report reaches numerous legal conclusions about whether Rivoire engaged in a manipulative or deceptive scheme or made misrepresentations; for example: Rivoire "did not improperly conceal HSBC's hedging activity from JBIC, nor did he (or anyone at HSBC) mislead JBIC or misrepresent any material facts," (Report ¶ 12(c)); "[N]one of Rivoire's communications suggested or encouraged fraud, market manipulation, or other improper

---

[6] These assertions are inadmissible for the additional reason that they are nothing more than second-hand narration and not based on any expertise or methodology. *See Mudd*, 2016 WL 2593980, at *4 ("Prof. Cornell's opinion about market understanding of FNMA's business is not expert testimony; it is mere narration and second-hand knowledge under the guise of claimed expertise.").

activity," (*id.* ¶ 12(h)); "The timing, manner of execution, volume, and market price impact of HSBC's trading activity was inconsistent with an intent to manipulate," (*id.* ¶ 94); "volume [of trading] was inconsistent with an intent to manipulate," (*id.* ¶ 98); "Rivoire's communications . . . *do not* reflect any suggestion that Najar should engage in market manipulation, fraud, or other misconduct," (*id.* ¶ 121 (emphasis in original); *see also id.* ¶ 133); Najar and McDonnell's communications "not reflective of anything that could be construed as manipulative behavior or misconduct," (*id.* ¶ 141; *see also id.* ¶ 154); Najar and O'Reilly communications not "a reference to market manipulation or other wrongful conduct," (*id.* ¶ 159); "nothing inappropriate about Rivoire's actions that would lead me to believe that there was any 'deceptive scheme' or encouragement of market manipulation," (*id.* ¶ 169); Rivoire's "concern related to the profitability of the issuer swap is not evidence of manipulative intent," (*id.* ¶ 172); Rivoire's actions during the pricing call were "not indicative of manipulative behavior," (*id.* ¶ 186).

Such opinions that Rivoire did not engage in a manipulative or deceptive scheme or make material misrepresentations are facially inadmissible. *See, e.g.*, *United States v. Scop*, 846 F.2d 135, 140-42 (2d Cir. 1988) (reversing conviction where expert had opined about "'manipulation' and 'fraud,'" thus presenting "legal conclusions that were highly prejudicial and went well beyond his province as an expert in securities trading"), *rev'd in part on reh'g on other grounds*, 856 F.2d 5 (2d Cir. 1988).

In addition to asserting facially improper legal conclusions, the Report also repeatedly uses cloaked legal opinion, referring dozens of times to Rivoire's trading and communications as being "appropriate," "reasonable" or "consistent with good market practice," (Report ¶ 12(a)), or "proper standards of market behavior" (*id.* ¶ 169); *see also id.* ¶ 94 (trading was "reasonable,

18

proportional, and consistent with good market practice"); *id.* ¶ 97 ("normal and appropriate risk management activity"); *id.* ¶ 161 (trading activity "in fact normal and appropriate"). The Report repeatedly opines that trading and other conduct is "good," "normal," "prudent" or consistent with "market practice" without ever defining any of those terms. (*Id.* ¶ 90, 95.)

Similarly, the Report asserts that communications by Rivoire and others were "appropriate" or otherwise consistent with undefined norms of behavior, (*id.* ¶ 12(h)), that there was "nothing inappropriate in Rivoire joining the pricing call and managing the later part of the call . . .," (*id.* ¶ 12(i)), and that Rivoire's communications with Najar were "normal and appropriate guidance" (*id.* ¶ 121). Mittleman further opines that the "[p]ush the screen" email was "normal and appropriate guidance"—and, to boot, "normal market practice" as well as "reasonable and appropriate," (*id.* ¶¶ 124, 128, 129, 131), and deems Rivoire's communications with senior HSBC personnel about the swap "mispricing" "reasonable and consistent with normal market practice," (*id.* ¶12(g)). In the same vein, Mittleman finds Najar and McDonnell's communications were "fully appropriate," (*id.* ¶ 141), "reasonable and appropriate," (*id.* ¶ 147), with nothing "inappropriate or unusual," (*id.* ¶ 144), and further that Rivoire's comments during the Pricing Call were "appropriate," (*id.* ¶ 188). Indeed, the Report ultimately opines that "Rivoire's conduct was, in all respects, appropriate and consistent with proper standards of market behavior," (*id.* ¶ 169), and "not indicative or manipulative behavior," (*id.* ¶ 186).

This testimony should all be excluded. The fundamental problem with permitting testimony that trading or communications were "reasonable" or "appropriate" or "consistent with good market standards" is that it "may suggest to the jury that their job is done, that they have been told the answer to an ultimate question." *See Tourre*, 950 F. Supp. 2d at 678. And these sorts of legal conclusions "cannot be saved by couching [that conclusory] opinion as 'industry

custom and practice." *Highland I*, 551 F. Supp. 2d at 182-83 ; *Luizzi v. Pro Transp., Inc*., No. 02 CV 5388 (CLP), 2011 WL 1655567, at *10 (E.D.N.Y. May 2, 2011) (rejecting "attempts to cloak [expert] testimony as being about industry customs" when such testimony "is still an opinion . . . which is not a proper subject matter for an expert opinion").

#### IV.    Mittleman's Testimony Regarding Economics Should be Excluded Because He Is Not Qualified to Testify on Economics

When presented with expert testimony, a court should assess "the threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *Nimely*, 414 F.3d at 396 n.11 (quoting Fed. R. Evid. 702). This includes analyzing "the totality of the witness's background to determine whether he or she exhibits any one or more of the qualifications listed in Rule 702 . . . with respect to a relevant field." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). The court should "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," which must overlap. *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). "[I]t is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely*, 414 F.3d at 399 n.13.

Here, Mittleman offers broad and conclusory assertions about economics—most significantly asserting as principal conclusion "B" that transactions by HSBC were executed at market prices that "reflected the normal market forces of supply and demand" and that HSBC did not "cause or transact at any artificial price." (Report ¶ 12(b).) The Report persistently opines that prices were not artificial or were the result of "supply and demand"—repeating that phrase 15 times—but does so with no analysis whatsoever, much less reliable principles and

20

methodology. Mittleman simply asserts that the transactions occurred, that prices were set by "supply and demand," and that resulting prices were thus not artificial. *See, e.g.*, *id.* ¶ 151 ("The price of the transaction was determined by the forces of supply and demand and was not artificial.")

Mittleman is not qualified to provide testimony concerning matters of economics: he is not an economist, did not testify as an economics expert, and would not answer questions about economics in his deposition. Mittleman does not have a degree in economics. When asked if he was an economist he stated that he "studied economics but I'm not a certified economist, no." (Mittleman Dep. 210:17-20, Decl. Ex. 5.) Mittleman did not cite any economic literature or survey to support his statements concerning supply and demand, (*id.* ¶ 211:2-6), and admitted that he was not testifying as an expert economist, (*id.* ¶ 210:22-24). When asked to opine as to whether there could be open market transactions that did not reflect the normal interplay of supply and demand, he demurred:

> Q.      Are there any situations in your view where there is a market with a buyer and a seller and the prices do not reflect the normal interplay of supply and demand?
> A.      In this case at hand, Najar was offering 6s3s basis in the market for prices discovery reasons and as he traded there was a normal interplay of where supply and demand cross.
> Q.      But as a hypothetical matter, are there any situations in which there is a market with a buyer and a seller in which the prices do not reflect the normal interplay of supply and demand?
> . . .
> A.      I don't want to speculate. As you mentioned, I am not testifying in an economist expert witness here.

(*Id.* 211:7-24.) Mittleman likewise demurred on other questions about economics including whether he would agree that in a market in which one party is deliberately manipulating prices, prices would not reflect the normal interplay of supply and demand ("A: I don't want to speculate on that matter"), (*id.* 212:2-9), or whether prices would reflect the normal interplay of

supply and demand where one party was trying to time transactions to maximize price action (A: I don't want to speculate on activity that didn't happen in this case."), (*id.* 213:9-18).

Not unsurprisingly, the resultant analysis is analytically unsound. Mittleman's Report—and his response to questions concerning matters of supply and demand—begin and end with the concept that as long as there is a buyer and a seller, the resulting price will reflect the law of supply and demand and thus cannot be artificial. But it's not necessarily so. Even open-market transactions can be manipulative—and thus not the result of normal or legitimate forces of supply and demand. *See Set Cap., LLC v. Credit Suisse Grp., AG*, 996 F.3d 64, 77 (2d Cir. 2021) ("Open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent.").

Further, Mittleman is silent as to whether the transactions at issue here were the result of *legitimate* forces of supply and demand. Among other things, Mittleman's "analysis" does not address the fact that Najar testified that the "whole, entire reason to sell [at the time of the pricing], was to push the screen," that he would not have been trading at that moment absent Rivoire's instruction to push the screen, and that he believed pushing the screen down was detrimental to his existing long basis position, i.e., was uneconomic. (Najar Dep. 230:17-232:8, Decl. Ex. 9); *see CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 247 (S.D.N.Y. 2012) ("a price may be artificial if it is [different] than it would have been absent Defendants' conduct"). Consequently, Mittleman's conclusory statements regarding supply and demand are not the result of a reliable methodology and should be excluded for that additional reason. *See Restivo*, 846 F.3d at 577 ("[T]he district court may consider the gap between the data and the conclusion drawn by the expert from that data, and exclude opinion evidence where the court conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered."

(quotation marks omitted)); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)

("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").

**V.    Mittleman Did Not Design, Operate or Manage Broker Screens and Is Not Qualified to Testify as to their Operations**

Mittleman's Report addresses "broker screens"—electronic pricing screens operated by

brokers containing pricing information in particular markets—in the sixteen-page Section VII of

the Report, "Analysis of ICAP Screen Issues Leading Up to and During the Pricing Call," and

submits as a "principal conclusion" that there were screens issues caused "solely by ICAP

personnel," (Report ¶ 12(d)). Mittleman conceded he never managed a broker screen, has never

been involved in the coding or other back-office work that is involved in running a broker

screen," and never worked for a broker. (Mittleman 198:20-199:13, Decl. Ex. 5).

Lacking in particular expertise as to screens, Mittleman's discussion of the screens was

based, according to Mittleman, upon his interpretation of "documents, depositions, [and]

testimony amongst various market participants." (*Id*. 214:11-15.) Information—if relevant—

about what happened with broker screens and who was responsible should be introduced by

witnesses, documents, and sworn testimony, and not mediated through an individual who does

not have expertise on the management and operation of screens.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court exclude Mittleman's Report, and associated testimony, as set forth above.

Dated: May 12, 2023

Respectfully submitted,

/s/ James G. Wheaton
James G. Wheaton
Devin Cain
Benjamin Rankin
R. Stephen Painter, Jr.

Commodity Futures Trading Commission
Division of Enforcement
290 Broadway, 6th Floor
New York, NY 10007
Phone: 646-746-9700

jwheaton@cftc.gov