UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHE RIVOIRE,<br><br>Defendant. | No. 19-CV-11701-LTS |

OPINION AND ORDER ON SUMMARY JUDGMENT AND EXCLUSION MOTIONS

U.S. COMMODITY FUTURES TRADING COMMISSION
By: Benjamin John Rankin
Devin Michael Cain
290 Broadway, Ste 6th Floor
New York, NY 10007

-and-

U.S. COMMODITY FUTURES TRADING COMMISSION
By: James Gardner Wheaton
Roby Stephen Painter, Jr.
140 Broadway, 19th Floor
New York, NY 10005

*Attorneys for Plaintiff Commodity Futures Trading Commission*

AKIN GUMP STRAUSS HAUER & FELD LLP
By: James Joseph Benjamin, Jr.
Emily L. Hansen
Fatima Mohammed Bishtawi
Izabelle Raven Tully
Katherine Louise Powers
Parvin Daphne Moyne
Victoria Fydrych
One Bryant Park
New York, NY 10036

*Attorneys for Defendant Christophe Rivoire*

LAURA TAYLOR SWAIN, CHIEF UNITED STATES DISTRICT JUDGE

The Commodity Futures Trading Commission ("Plaintiff" or the "Commission") asserts three causes of action against Christophe Rivoire ("Defendant" or "Rivoire") in connection with an interest rate swap transaction. The Commission alleges that Rivoire caused improper and undisclosed trading during the pricing of a swap transaction. These trades allegedly affected the benchmarks used for pricing the swap transaction, to the benefit of Rivoire and his institution and to the detriment of the swap counterparty. The Commission brings three claims against Rivoire under the Commodity Exchange Act ("CEA"), 7 U.S.C.A. §§ 1-27f (Westlaw through P.L. 119-103), and regulations promulgated thereunder. Count One is a claim under 7 U.S.C. section 9(1) ("Section 6(c)(1)" of the CEA) and 17 C.F.R. section 180.1 ("Rule 180.1"); Count Two is a claim under 7 U.S.C. section 13c(b) ("Section 13(b)" of the CEA); and Count Three is a claim under 7 U.S.C. section 13c(a) ("Section 13(a)" of the CEA). (Docket entry no. 1 ("Compl.") ¶¶ 129-44.) The Court has subject matter jurisdiction of this action under 28 U.S.C. sections 1331 and 1345.

This Opinion addresses four motions. First, the Commission moves for summary judgment on all counts (docket entry no. 101), and Rivoire cross-moves for summary judgment on all counts (docket entry no. 110). Rivoire also moves to exclude portions of the expert opinions of Terence Mark, Justin Regus, and Anjan V. Thakor. (Docket entry no. 118.) Finally, the Commission moves to exclude the expert opinion of Alan S. Mittleman. (Docket entry no. 121.) The Court has considered carefully the parties' submissions, as well as each expert's report and deposition testimony. For the reasons discussed below, both motions for summary judgment are denied, Rivoire's motion to exclude is granted in part and denied in part, and the Commission's motion to exclude is granted in part and denied in part.

## I. BACKGROUND

This Opinion and Order recites only the facts necessary to resolve the motions before the Court. The following background summary is, unless otherwise noted, drawn from the undisputed facts in the pleadings and documentary exhibits submitted by the parties.[1] All timestamps referenced herein are in Eastern Daylight Time ("EDT") and are approximate.

Generally, where facts recited in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence and are denied with only a conclusory statement by the other party, the Court treats such facts as uncontroverted. See LOCAL CIVIL RULE 56.1(c)-(d); Big Vision Priv. Ltd., v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d 224, 229 n.2 (S.D.N.Y. 2014). Where a nonmoving party fails to respond to a Local Rule 56.1 Statement, the Court may "conclude that the facts asserted in the statement are uncontested and admissible." T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009). "Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." Jackson v. Fed. Express, 766 F.3d 189, 194 (2d Cir. 2014). "In doing so, the court may rely on other evidence in the record even if uncited." Id. (citing FED. R. CIV. P. 56(c)(3)).

1 Citations to "56.1 St." refer to both Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1 (docket entry no. 104) and Defendant's Response thereto (docket entry no. 115). Citations to "56.1 Counterst." refer to both Defendant's Statement of Material Facts Pursuant to Local Civil Rule 56.1 (docket entry no. 112) and Plaintiff's Response thereto (docket entry no. 126). Citations to each of these Local Rule 56.1 statements incorporate by reference the documents and deposition testimony cited therein. See LOCAL CIVIL RULE 56.1(d). Likewise, citations to each party's briefs incorporate by reference the citations to the materials and exhibits cited therein.

A. The Swap Transaction

Christophe Rivoire was the head of the North American rates business of HSBC Bank USA, N.A., the U.S. affiliate of global investment bank HSBC Holdings plc (together with HSBC Bank USA, N.A., "HSBC"). (56.1 St. ¶ 2.) Rivoire worked in HSBC's office in Manhattan and oversaw HSBC's interest rates business in North America, including HSBC's New York-based U.S. Dollar interest rate swap trades. (Id. ¶¶ 2-3.)

The Japan Bank for International Cooperation ("JBIC") is a financial institution wholly owned by the Japanese government. (Id. ¶ 9.) In May 2012, JBIC indicated to HSBC that it intended to issue a bond in July 2012 (the "Bond"). (Id. ¶ 10.) On July 11, 2012, JBIC came to market with a $2 billion bond offering that had a five-year maturity and paid a coupon rate of 1.125% every six months. (56.1 Counterst. ¶ 181.) JBIC selected HSBC as an underwriter and joint lead manager for the Bond issuance. (56.1 St. ¶ 12.)

JBIC also chose HSBC for a "fixed-for-floating interest rate swap" transaction (the "Swap"), pursuant to which HSBC would pay JBIC a fixed interest rate every six months, and JBIC would pay HSBC a floating interest rate (based on six-month LIBOR[2] plus an additional amount) every six months. (Id. ¶¶ 13-14.) The additional amount was negotiated between JBIC and HSBC, and the Commission's claims focus principally on the events and communications surrounding the parties' determination of the additional amount. By entering into the Swap, JBIC converted its interest rate exposure on the Bond from a fixed to a floating rate. (Id. ¶ 14.) Such interest rate swaps, commonly called "issuer swaps," allow public-sector issuers like JBIC to align their cash flows with their future liabilities. (56.1 Counterst. ¶ 185.)

2 The London Interbank Offered Rate, or LIBOR, was a benchmark interest rate that was published daily based on the interest rates at which major global banks borrowed from one another. (56.1 St. ¶ 14 n.1.)

B. Pricing the Swap

During the process of pitching for the Swap, HSBC underpriced its "swap cost" premium, which would be one component of the floating rate payments that JBIC would make to HSBC under the Swap. (See 56.1 St. ¶¶ 27-46; 56.1 Counterst. ¶¶ 193-98.) As a result of this oversight, HSBC's New York Rates desk, which was supervised by Rivoire, stood to incur approximately $600,000 in losses. (56.1 St. ¶¶ 32-34.) HSBC asked JBIC to increase the "swap cost" premium, but JBIC declined, and the parties proceeded with the mispriced premium component. (Id. ¶¶ 35-38; 56.1 Counterst. ¶¶ 196-97.) To compensate for the mispricing, HSBC's Debt Capital Markets business agreed to pay an internal subsidy to the New York Rates desk. (56.1 St. ¶¶ 39-40; 56.1 Counterst. ¶ 312.)

The other components of the Swap price were determined in a pricing call, which took place on July 11, 2012, at 11:30 AM (the "Pricing Call"). (56.1 St. ¶¶ 15-16.) The price was determined through a formula that took into account, among other things, the spot (i.e., current) prices of five-year U.S. Treasury securities, five-year U.S. Dollar swap spreads,[3] and five-year U.S. Dollar 6s3s basis swaps ("Five-Year Basis Swaps"),[4] as well as the one-week forward price for Five-Year Basis Swaps. (Id. ¶ 15.) Prices for Five-Year Basis Swaps are measured in basis points ("bp"), with one basis point equal to 1/100th of 1%, or 0.01%. (Id. ¶ 28 n.8.) JBIC requested that these prices be quoted from specific pricing screens. (Id. ¶¶ 19-20; 56.1 Counterst. ¶ 209.) JBIC prepared a script for the Pricing Call and, under the

3 Such a swap spread refers to the difference, or spread, between the yields on a U.S. Dollar fixed-for-floating interest rate swap and a U.S. Treasury security of the same maturity. (56.1 St. ¶ 15 n.2.)

4 In a 6s3s basis swap, one party pays six-month LIBOR and the other party pays three-month LIBOR, plus a spread, at fixed intervals for the duration of the swap. (56.1 St. ¶ 15 n.3.)

script, HSBC would read the prices from the specified pricing screens. (56.1 Counterst. ¶¶ 206, 209.) JBIC also prepared a pricing spreadsheet, and HSBC input the prices into the spreadsheet to determine the price of the Swap. (Id. ¶¶ 206-207.)

The one-week forward price was the cost of entering into a transaction starting one week in the future, and it was related to the spot price through a mathematical calculation called a "forward curve." (Id. ¶ 211.) Under the formula used to price the Swap, the one-week forward price for Five-Year Basis Swaps was used to calculate a "Forward Rate Adjustment." (56.1 St. ¶ 20.) The Forward Rate Adjustment was equal to the one-week forward price for Five-Year Basis Swaps minus the spot price of the Five-Year Basis Swap. (Id.) The Forward Rate Adjustment was intended to account for the approximately one-week delay in the starting date of the Swap from the day of the Pricing Call. (Id. ¶ 15 n.4.)

All else being equal, a lower Five-Year Basis Swap spot price would mean that JBIC would have to pay a higher rate of interest to HSBC under the Swap. (Id. ¶ 25.) If the Five-Year Basis Swap spot price decreased by a quarter of a basis point (–0.25 bp), JBIC would have to pay HSBC approximately $250,000 in additional interest over the full term of the Swap. (Id.) Similarly, all else being equal, a lower Forward Rate Adjustment would mean that JBIC would have to pay a higher rate of interest under the Swap. (Id. ¶ 26.) If the Forward Rate Adjustment decreased by a tenth of a basis point (–0.1 bp), JBIC would have to pay HSBC approximately $100,000 in additional interest over the full term of the Swap. (Id.)

The prices of U.S. Dollar interest rate basis swaps were published on pricing screens maintained by Reuters, which licensed the underlying pricing information from ICAP plc. ("ICAP"). (Id. ¶ 18.) ICAP is an interdealer broker firm that facilitates transactions between banks and earns fees from executed transactions. (Id.; 56.1 Counterst. ¶ 203.) Only ICAP

employees could change the prices that were displayed on the screens and, as a matter of practice, ICAP employees typically changed the screen prices in response to activities in the market, such as bids, offers, and executed transactions. (56.1 St. ¶ 23.) At the time of the Pricing Call, ICAP employees updated pricing information on screens manually. (56.1 Counterst. ¶ 252.)

During the Pricing Call, traders from HSBC were to provide quotes for the relevant inputs by referencing certain ICAP pricing screens. (56.1 St. ¶¶ 17-18.) Specifically, the spot price for five-year Treasury securities and five-year U.S. Dollar swap spreads would be quoted from the ICAP "19901" screen; the spot price for Five-Year Basis Swaps would be quoted from the ICAP "19905" screen; and the Forward Rate Adjustment would be quoted from the ICAP "USDBASIS" screen. (Id. ¶ 19; 56.1 Counterst. ¶¶ 209, 214.) The spot price of Five-Year Basis Swaps was displayed on both the 19905 and USDBASIS screens, but the one-week forward price for Five-Year Basis Swaps was displayed only on the USDBASIS screen. (56.1 St. ¶ 20; 56.1 Counterst. ¶ 255.) To calculate the Forward Rate Adjustment, both the spot price and the one-week forward price of Five-Year Basis Swaps were to be obtained from the ICAP USDBASIS screen, even though the spot price was also displayed on the ICAP 19905 screen. (56.1 St. ¶ 20; 56.1 Counterst. ¶¶ 209, 214.)

There were two relevant differences between the ICAP 19905 and USDBASIS screens. First, the screens used different display conventions. (56.1 Counterst. ¶ 256.) Second, prior to the Pricing Call, the pricing information on the 19905 screen was updated by ICAP employees in New York, while the pricing information on the USDBASIS screen was updated by ICAP employees in London and Tokyo. (Id. ¶ 257.) On the morning of July 11, 2012, before the 11:30 AM Pricing Call, ICAP transferred control of the spot price on the USDBASIS screen

from its London office to its New York office. (Id. ¶ 266.) At that time, however, ICAP did not transfer control of the one-week forward price on the USDBASIS screen. (Id. ¶ 267.) Accordingly, during the Pricing Call, ICAP's New York office could directly update the spot price on the USDBASIS screen, but not the one-week forward price on that screen. (Id. ¶ 269.)

C. Events Preceding the Pricing Call

The Commission proffers evidence that Rivoire was concerned about losing money and discussed moving markets and controlling the execution of the Swap in order to minimize losses. During a June 27, 2012 call with Stephen Tsang, the co-head of HSBC's Asia rates business, Rivoire allegedly said that "when you know that you have to buy $2 billion of 5 years [i.e., Five-Year Treasuries] you can push the market, I mean obviously, a tick or whatever . . . immediately[5] it's 300 or 400k you can make." (56.1 St. ¶¶ 47-48.) On the same call, Tsang asked, "Can we make any money on the [Swap]?" (Id. ¶ 49.) Rivoire responded, "Ah, if we are lucky we can as well, huh? If we can push the, the spreads [a] quarter of a basis point." (Id.) Rivoire also proffers Tsang's testimony that "push the spread" means making "trades into the market" and "cross[ing] a bid offer" (docket entry no. 113-14, at 117), as well as Rivoire's own testimony that "push the market" referred to the fact that any hedging transactions might affect the market (docket entry no. 113-11 ("Rivoire Dep.") at 239).

Additionally, in a July 5, 2012 email to HSBC employee Morgan Najar, Rivoire wrote, "So we'll need to push the screen as much as we can before the pricing." (Docket entry no. 103-26, at 2 (emphasis added).) In his declaration, Najar stated, "I understood the instruction to 'push the screen' to mean that I needed to sell 5-year basis swaps at ICAP to lower the prices of those swaps on the ICAP screens at the moment of pricing." (Docket entry no. 103-40 ¶ 6.)

---

5 Rivoire contends that he said "admittedly" rather than "immediately." (56.1 St. ¶ 48.)

Najar also stated that he "understood Rivoire wanted to 'push the screen' to get [a] better price for HSBC on the swap with JBIC" and that "a better price for HSBC meant a worse price for JBIC." (Id. ¶¶ 7-8.)

The Commission also asserts that Najar engaged in unusual trading practices to implement Rivoire's instruction to "push the screen." Najar testified that he avoided selling Five-Year Basis Swaps in the days leading up to the Pricing Call to "save . . . my ammunition for the pricing." (56.1 St. ¶ 79 (quoting docket entry no. 103-12 ("Najar Dep.") at 72).) Najar also testified that he would have traded earlier and over a longer period of time but for Rivoire's instruction. (Id. ¶ 81.) Rivoire, however, provides alternative explanations for Najar's behavior, pointing to evidence that Najar tried to sell Five-Year Basis Swaps in the days leading up to the Pricing Call in an attempt to pre-hedge, but there were no bidders at the prices he posted. (Id. ¶¶ 77-83.) According to Rivoire, Najar found buyers only once he started lowering the price. (Id.) Though the Commission contends that pushing down the prices of Five-Year Basis Swaps disadvantaged Najar's existing long position and could have only been done for the purpose of price manipulation, Rivoire asserts that, if Najar had failed to adequately hedge the risk from the Swap, Najar would have incurred even greater losses relative to his existing long position. (Id. ¶ 85.)

On July 9, 2012, two days before the Pricing Call, Najar told Mike McDonnell, an ICAP broker, that "we're pricing something, and they're using" the USDBASIS screen. (Id. ¶ 87.) Najar then told McDonnell, "I'm going to need to move that" and "I'm going to give you prices and I just need you to move it." (Id.) McDonnell replied, "I understand" and agreed to "find out" about the USDBASIS screen. (Id.)

The Commission also proffers evidence taken from Najar's instant message chats with James O'Reilly, another HSBC trader on the swaps desk. For example, on July 9, 2012, Najar sent the following messages to O'Reilly: "so this deal gonna be like 2-2.5b[illion] 6s3s 5yrs [Five-Year Basis Swaps]"; "i have to buy at mid"; "and i have to move ICAPs screen." (Id. ¶ 75.) A few minutes later, Najar sent: "this is gonna be bad"; "i'm gonna sell the crap out of it"; "get the other screens down"; "but this numbnuts wont adjust this 1wk [one-week] fwd screen." (Id.; docket entry no. 103-28, at 4.)

D. The Pricing Call

The Pricing Call was held via a conference call on July 11, 2012, at 11:30 AM, with representatives from JBIC and HSBC participating. (56.1 St. ¶¶ 16, 118.) The Pricing Call included a dry, or practice, run before the live pricing. (Id. ¶ 120.) At 11:36 AM, during the dry run, HSBC employee Kazuaki Ohno quoted the Five-Year Basis Swap spot price from the ICAP 19905 screen as 15.50 bp and the Forward Rate Adjustment from the ICAP USDBASIS screen as negative 0.1 bp (based on a one-week forward price of Five-Year Basis Swaps of 15.3 bp and a spot price of Five-Year Basis Swaps of 15.4 bp). (Id. ¶ 122.)

At 11:37 AM, around the time the live pricing portion of the Pricing Call began, Najar told McDonnell on a telephone call that he wanted to sell $500 million worth of Five-Year Basis Swaps at 15.375 bp. (Id. ¶ 125.) McDonnell confirmed the trade, and then Najar said "Mike, get the screen down." (Id.) After approximately 15 seconds, Najar stated, "Now, Mike! . . . Get the screen down." (Id.)

At 11:37 AM, the participants on the Pricing Call began the live pricing of the Swap. (Id. ¶ 123.) Also at 11:37 AM, ICAP moved the spot price of Five-Year Basis Swaps on the USDBASIS screen from 15.4 to 15.3 bp. (Id. ¶ 128.) At 11:40 AM, ICAP again moved the spot price of Five-Year Basis Swaps on that screen from 15.3 to 15.2 bp; the one-week forward

price remained shown as 15.3 bp. (Id. ¶ 132.) Also at 11:40 AM, an HSBC employee, Daniel Douglas, quoted the Five-Year Basis Swap price from the ICAP 19905 screen as 15.25 bp and the Forward Rate Adjustment from the USDBASIS screen as negative 0.1 bp. (Id. ¶¶ 134-35.)

At 11:40 AM, Ohno stated, "Currently, uh, spot, uh, 3-month 6-month is 15.2, and one week forward is 15.3, so 1-week delay would be plus 0.1, I think." (Id. ¶ 136.) That is, he indicated a Forward Rate Adjustment of positive 0.1 bp (based on a 15.2 bp spot price and a 15.3 bp one-week forward price) rather than negative 0.1 bp, as had previously been quoted by Douglas. (Id.) Douglas responded, "Ok, sorry uh, let me uh, let me talk to my basis trader, one second." (Id.) Najar then stated, "The screen has a delay on it, that's the problem. I mean, the forward cannot be higher than spot, it's math — it's impossible. Look at, look at the 4-year, the 4-year is two tenths lower, for the 5-year to be one tenth higher it's impossible. . . . There's a problem with the screen right now." (Id. ¶ 139.)

At 11:43 AM, ICAP moved the spot price of Five-Year Basis Swaps on USDBASIS from 15.2 bp to 15.0 bp; the one-week forward price remained displayed as 15.3 bp. (Id. ¶ 141; 56.1 Counterst. ¶ 290.) Consequently, the Forward Rate Adjustment changed to positive 0.3 bp. At 11:44 AM, a participant on the Pricing Call noted this price movement. (56.1 St. ¶ 143.) Najar then stated, "There's a problem with their page, obviously. It's, it's . . . that mathematically can't happen." (Id.) After Najar spoke, Ohno stated, "Yes actually it's moving a lot." (56.1 Counterst. ¶ 292.)

At 11:46 AM, Rivoire spoke for the first time on the Pricing Call. He stated:

> Clearly, there is a latency issue on the forward. We need to wait for the screen to be adjusted, and obviously for the forward to reflect the move we have seen on the spot, because that's, I mean, clearly wrong. That's clearly wrong. I mean, there is a latency issue on their side. Obviously we are not controlling the screen. The reason is, when the spot is moving,

> by definition, the forward is moving as well. And I'm sure you appreciate it. There is a latency issue and we need to wait, uh, to fix it.

(Id. ¶ 294 (emphasis added).)

At 11:48 AM, a JBIC representative asked, "Would there be any type of problem if we were to use the numbers that we had seen during the dry run process?" (56.1 St. ¶ 149.) Ohno confirmed that, under that proposal, the "one-week delay would be minus 0.1." (Id.) Rivoire chimed in, stating that "we're not going to be able to use the dry run number in the sense that the spot has moved slightly but the spot has moved and we cannot ignore it." (Id. ¶ 153.) The one-week forward price of Five-Year Basis Swaps on the USDBASIS screen decreased in the following minutes, from 15.3 bp to 15.0 bp, and the spot price moved from 15.0 bp to 15.3 bp. (Id. ¶¶ 150-51, 156.)

At 11:51:16 AM, McDonnell asked Najar, "15 3 on the spot and 15 even on the one-week, will that work?" (Id. ¶ 155.) Najar responded, "Just, you know what? Just leave it, just leave it." (Id.) At 11:52:29 AM, Najar told McDonnell, "Don't move it." (Id. ¶ 159.) McDonnell responded, "It's, it's stuck — it's at 15. You want it up again, let me know. The second page was not linked into the first page when we took over. That was the problem, which we just found out." (Id.) Najar replied, "Mike, I asked you three fucking days ago to find this out." (Id.) McDonnell said, "I know, I wasn't aware of the second page." (Id.)

At 11:51:45 AM, after the most recent change in prices on the USDBASIS screen, Ohno asked, "Can't we spot 15.3 and 1-week forward 15.0 so minus 0.3?" (Id. ¶ 157.) Rivoire responded, "Ok though if you want to spot what we have on the screen now which is 15.3 for the spot, and 15 for the forward, that's fine for us." (Id.) At 11:52:00 AM, Rivoire asked, "OK can we do it? The 15.3 spot, forward 15.0." (Id. ¶ 158.) At 11:52:37 AM, Rivoire again asked, "So can we agree on the 15.3 spot and 15.0 on the forward basis?" (Id. ¶ 160.) At 11:53:28 AM, the

JBIC representative stated, "Yes we're fine." (Id. ¶ 161.) Rivoire responded, "You're fine with the 15.3 spot and 15.0 forward, right?" (Id.) The JBIC representative responded, "Yes." (Id.) Rivoire answered, "OK so we are fine as well. So it is priced." (Id.)

Ultimately, as a result of the Pricing Call, the spot price of Five-Year Basis Swaps was determined to be 15.25 bp from the 19905 screen, and the Forward Rate Adjustment was determined to be negative 0.3 bp from the USDBASIS screen. (Id. ¶ 163.) The spot price of Five-Year Basis Swaps and the Forward Rate Adjustment were lower at the time of the Pricing Call than when Najar first began communicating with McDonnell earlier that morning. (Id. ¶¶ 103, 117.) The Commission's expert witness, Justin Regus, claims that this difference in pricing inputs equates to a revenue differential of approximately $710,111 in favor of HSBC over the term of the Swap compared to the revenue that HSBC would have received had the Forward Rate Adjustment been higher. (Id. ¶ 166; docket entry no. 129-3 ("Regus Rep.") at 15.) Rivoire's expert witness, Alan S. Mittleman, calculates this difference to be approximately $703,111. (56.1 St. ¶ 166; docket entry no. 123-1 ("Mittleman Rep.") ¶ 204.)

On July 11, 2012, the day of the Pricing Call, Najar made a series of trades involving U.S. Dollar 6s3s basis swaps. Najar's trades are summarized here:

| Execution Time (EDT) | Buy/Sell | Tenor | Price (bp) | Notional (U.S. Dollars) | Broker |
|---|---|---|---|---|---|
| 7:31 AM | Sell | 4-year | 16.75 | 125,000,000 | ICAP |
| 9:02 AM | Sell | 4-year | 16.75 | 100,000,000 | ICAP |
| 10:15 AM | Sell | 7-year | 14.75 | 75,000,000 | Tullet |
| 10:24 AM | Sell | 6-year | 14.75 | 100,000,000 | Cantor |
| 10:24 AM | Sell | 5-year | 15.25 | 200,000,000 | ICAP |
| 10:25 AM | Sell | 5-year | 15.25 | 100,000,000 | ICAP |
| 10:25 AM | Sell | 5-year | 15.25 | 200,000,000 | ICAP |
| 10:27 AM | Sell | 5-year | 15.375 | 250,000,000 | ICAP |
| 11:37 AM | Sell | 5-year | 15.375 | 400,000,000 | ICAP |
| 11:37 AM | Sell | 5-year | 15.375 | 100,000,000 | ICAP |

(Docket entry no. 113-40, at 2.) On July 11, 2012, at 11:56 AM, minutes after the Swap had been priced, Najar stated in an instant message to a trader at another financial institution, "I did 2 billion 6s3s today." (56.1 St. ¶ 173.) The other trader asked Najar "how do u get out?" (Id.) Najar responded, "i hit the sh[i]t out of it before hand" and it "worked out amazingly." (Id.) Najar also said that he had "moved the damn thing . . . 0.75." (Id.)

## II. DISCUSSION

### A. Cross Motions for Summary Judgment

The Court first turns to the parties' motions for summary judgment. Summary judgment is to be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). The Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Stern v. Trs. of Columbia Univ. in the City of N.Y., 131 F.3d 305, 312 (2d Cir. 1997). Where the party

opposing summary judgment "fails to properly address another party's assertion of fact," the Court may "consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e)(2).

1. Count One

In Count One, the Commission alleges that Rivoire violated Section 6(c)(1) of the CEA and Rule 180.1. Section 6(c)(1) makes it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate." 7 U.S.C. § 9(1). To effectuate Section 6(c)(1), the Commission promulgated Rule 180.1. That regulation provides in pertinent part that a person shall not "intentionally or recklessly":

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

17 C.F.R. § 180.1(a)(1)-(3) (2026).

Section 6(c)(1) is a relatively new provision. It was signed into law as part of the Dodd-Frank Act, a set of comprehensive business regulations passed in the aftermath of the 2008 Great Recession. See United States v. Phillips, 155 F.4th 102, 113 (2d Cir. 2025), cert. denied, No. 25-1237, 2026 WL 1780066 (U.S. June 22, 2026). As the Commission stated in its rulemaking, Section 6(c)(1) was intended to "augment the Commission's existing authority to prohibit fraud and manipulation." 76 Fed. Reg. 41398, 41401 (July 14, 2011). Notably, Section 6(c)(1) and Rule 180.1 mirror 15 U.S.C. section 78j(b) ("Section 10(b)" of the Securities

Exchange Act of 1934) and 17 C.F.R. section 240.10b-5 ("Rule 10b-5"), respectively.[6] Because of these similarities, "courts have looked to the securities laws when called upon to interpret similar provisions of the CEA." Phillips, 155 F.4th at 129 (quoting Loginovskaya v. Batratchenko, 764 F.3d 266, 272 (2d Cir. 2014)).

In Count One, the Commission alleges that Rivoire "directed Trader A [Najar] to engage in a manipulative scheme to push the prices of Five-Year Basis Swaps down on the Broker Screens in order to benefit [HSBC] on the Issuer Swap to the detriment of [JBIC]." (Compl. ¶ 133.) The Commission asserts that Rivoire's alleged conduct thus violated Section 6(c)(1) and Rules 180.1(a)(1), (2), and (3). (Id. ¶¶ 134-37.)

---

6 Section 10(b) similarly prohibits, "in connection with the purchase or sale of any security . . . or any securities-based swap agreement," the use of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 makes it "unlawful for any person, directly or indirectly":

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2026).

i. Claims Under Section 6(c)(1) and Rules 180.1(a)(1) and (3)

The requisite elements for liability under Section 6(c)(1) and Rules 180.1(a)(1) and (3) are "(1) misrepresentation or deception, (2) materiality, and (3) scienter."[7] Phillips, 155 F.4th at 124. For otherwise legitimate, open-market trading to be actionable under Section 6(c)(1), such trading "'must be willfully combined with something more to create a false impression of how market participants value a security.' That something more is fraudulent intent." Id. at 124-25 (citation omitted) (quoting ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 101 (2d Cir. 2007)).

The parties initially argued whether the Commission was required under Section 6(c)(1) and Rule 180.1 to show the creation of an artificial price (Pl. Mem. at 15; Def. Mem. at 42), but the Second Circuit has since spoken. In Phillips, the Second Circuit recognized that the Dodd-Frank Act's changes "cover a broader swath of fraudulent and manipulative activity in swaps markets" than the previous version of the CEA. 155 F.4th at 129; see also In re Amaranth Nat. Gas Commodities Litig., 730 F.3d 170, 173 n.1 (2d Cir. 2013) (describing pre- and post-amendment changes). Analogizing to Section 10(b) and Rule 10b-5, the Second Circuit held that a violation of Section 6(c)(1) and Rule 180.1 "may exist in the absence of any market or price effect." Phillips, 155 F.4th at 130 (quoting 76 Fed. Reg. at 41401). Rivoire's supplemental submission to the Court accordingly makes no mention of an artificial price requirement post-

---

7 Like the parties, the Court does not make any distinction between Rules 180.1(a)(1) and (3) for purposes of this analysis. (See docket entry no. 102 ("Pl. Mem.") at 14; docket entry no. 111 ("Def. Mem.") at 48 n.26.) Indeed, in the securities context, courts apply the same test to analyze Rule 10b-5(a) and (c) claims. United States v. Hunt, No. 05-CR-0395-DAB, 2006 WL 2613754, at *4 (S.D.N.Y. Sept. 6, 2006); see Lorenzo v. Sec. & Exch. Comm'n, 587 U.S. 71, 81 (2019) ("It should go without saying that at least some conduct amounts to 'employ[ing]' a 'device, scheme, or artifice to defraud' under subsection (a) as well as 'engag[ing] in a[n] act . . . which operates . . . as a fraud' under subsection (c)." (alterations in original)).

Phillips. (See docket entry no. 138, at 1-4.) The Court therefore holds that the Commission need not show the creation of an artificial price to plead a viable claim under Count One.

The Commission claims that it is thus entitled to summary judgment on Count One. The record, which identifies multiple genuinely disputed material issues of fact underlying elements of liability under Section 6(c)(1) and Rules 180.1(a)(1) and (3), belies that claim. According to the Commission, Rivoire's "push the screen" email to Najar was an instruction to "sell Five-Year Basis Swaps through ICAP to drive prices lower to benefit HSBC on the swap, to the detriment of JBIC." (Pl. Mem. at 7.) Rivoire, on the other hand, proffers evidence that his "push the screen" email was actually about pre-hedging, or hedging before the Pricing Call. (Def. Mem. at 17-22.) Citing testimony from Najar and his direct supervisor, Joseph Mosca, who were both in the email discussion, Rivoire contends that he was encouraging Najar to pre-hedge and trade before the Pricing Call. (See id. at 20.) According to Rivoire, pre-hedging was inconsistent with the Commission's price manipulation theory because manipulation in aid of affecting the price of the JBIC swap would have been most effective if done by trading during the Pricing Call. (Id.) Rivoire also proffers his own testimony that he was aware that the ICAP screens were "not perfectly reliable, due to latency issue," and that "push the screen" accordingly meant to "[m]ake sure the prices on the screens reflect the market prices." (Id. at 22 (quoting Rivoire Dep. at 214).)

The Commission also argues that Najar contacted ICAP to make sure that he would be able to move the USDBASIS Screen, and during the Pricing Call, Najar even went so far as to tell McDonnell what prices should be displayed on the screens. (Pl. Mem. at 8-9, 17-18.) For his part, Rivoire cites Najar's and McDonnell's testimony to explain that "Najar asked McDonnell to move ICAP's screen prices because the screen was wrong. . . . [T]he whole

point of Najar's statements to McDonnell was that the screens should be accurate." (Def. Mem. at 47 (emphasis omitted).) Rivoire also points to technical issues with the ICAP screens and Najar's attempted resolution of these problems. (Id. at 24-29, 47.)

Additionally, the Commission contends that Najar's chat messages with O'Reilly show that "[b]oth before and on the day of the July 11, 2012 Pricing Call, Najar discussed with James O'Reilly . . . Rivoire's direction to push the screen, including just how low Najar would be able to drive prices." (Pl. Mem. at 7.) Rivoire disputes this characterization, arguing that most of these chat messages were, as Najar described them in his deposition, "sarcasm." (Def. Mem. at 22 (quoting Najar Dep. at 172).) Rivoire also cites evidence that Najar was only referring to hedging transactions and to ensuring that ICAP would update the screens to accurately and timely reflect those hedging transactions. (Id. at 23.) For example, with respect to Najar's July 9, 2012 "i'm gonna sell the crap out of it" message, Najar testified that he was not telling O'Reilly that he was planning to engage in price manipulation, but rather that he was concerned that ICAP would fail to accurately update its screens after his hedging transactions. (Id. (citing Najar Dep. at 417).)

Both parties thus present genuine issues of material fact regarding whether Rivoire engaged or attempted to engage in a manipulative scheme to defraud a counterparty to a swap transaction. Each of these disputes regarding Rivoire and Najar's communications show that the Commission and Rivoire proffer competing evidence as to the intent and materiality requirements of Section 6(c)(1) and Rules 180.1(a)(1) and (3). See U.S. Commodity Futures Trading Comm'n v. Moncada, 31 F. Supp. 3d 614, 615-16 (S.D.N.Y. 2014) (denying summary judgment where the commodity trader's intent was materially disputed). Because the above

issues of material fact bear directly on the elements of the claims in Count One, neither party is entitled to judgment as a matter of law.

ii. Claim Under Section 6(c)(1) and Rule 180.1(a)(2)

Rule 180.1(a)(2) makes it unlawful to "[m]ake, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading." 17 C.F.R. § 180.1(a)(2). Like claims under Section 6(c)(1) and Rules 180.1(a)(1) and (3), a claim under Rule 180.1(a)(2) requires that the Commission show: "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc., 894 F.3d 1313, 1325 (11th Cir. 2018) (citation omitted); see also Sec. & Exch. Comm'n v. Frohling, 851 F.3d 132, 136 (2d Cir. 2016) (analogous securities fraud precedent). The Commission claims that, during the Pricing Call, Rivoire made a misleading misrepresentation when he said "[o]bviously we are not controlling the screen" and that Rivoire omitted the material fact that he had directed Najar to engage in price manipulation. (Pl. Mem. at 20-21.)

Neither the Commission's nor Rivoire's arguments are sufficient to demonstrate that either is entitled to summary judgment. First, the Commission points to evidence that Rivoire directed Najar to decrease the rates that would appear on the pricing screens and argues that Rivoire stated falsely that "we are not controlling the screens" during the Pricing Call. Rivoire argues that his statement, "[o]bviously we are not controlling the screen," was accurate. (Def. Mem. at 50-51.) He proffers evidence that ICAP's screens displayed mathematically impossible rates and argues that Najar's attempts to rectify the prices did not make Rivoire's statement false. Genuine disputes of material fact exist as to the accuracy of ICAP's screens, whether Najar directed ICAP to change the screen prices, and whether ICAP's technical

problems caused the price movements on ICAP's screens, as discussed above. As a result, neither party is entitled to summary judgment on the Commission's fraud claim. See Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd., 708 F. Supp. 3d 450, 482 (S.D.N.Y. 2023) ("Whether to credit the [agency's] interpretation or defendants' interpretation of the statement at issue, or whether any distinction between those interpretations would have been material to a reasonable investor, is a question for a jury, not for the Court.").

Rivoire also argues that he had no duty at all to disclose additional information about his directives to Najar, as the Commission suggests, because HSBC transacted business at arm's length with JBIC. (Def. Mem. at 50.) However, once Rivoire spoke about control of the screens during the Pricing Call, he had a duty to speak truthfully. See Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues."); Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."). Genuine disputes of material fact exist as to whether Rivoire spoke truthfully, including whether Rivoire's "[o]bviously we are not controlling the screen" statement was rendered misleading by virtue of material omissions.

Finally, Rivoire argues that the Commission's "bootstrap theory" of liability (i.e., that Rivoire failed to disclose his price manipulation scheme) "has not been accepted by the Second Circuit." (Def. Mem. at 51 (citing Levitt v. J.P. Morgan Sec., Inc., 710 F.3d 454, 467 n.9 (2d Cir. 2013)).) In Levitt, the Second Circuit noted "some disagreement over whether the act of market manipulation itself triggers a duty to disclose" and explicitly stated that it "need not address the question." 710 F.3d at 467 n.9. Because the parties have not fully briefed the

"bootstrap theory," and because there are genuine disputes of material fact as to whether Rivoire engaged in a manipulative scheme in the first place, Rivoire's motion is denied insofar as it is based on this defense as well.

* * *

For the foregoing reasons, the parties' respective motions for summary judgment as to Count One, which raises claims under Section 6(c)(1) and Rules 180.1(a)(1), (2), and (3), are denied.

2. Counts Two and Three: Control Person Liability Under Section 13(b) and Aiding and Abetting Under Section 13(a)

In Count Two, the Commission asserts a claim under Section 13(b), which provides that "[a]ny person who, directly or indirectly, controls any person who has violated any provision of [the CEA] or any of the [Commission's] rules . . . may be held liable for such violation . . . to the same extent as such controlled person." 7 U.S.C. § 13c(b). The statute also provides that the Commission must prove "that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." Id. In Count Three, the Commission asserts a claim against Rivoire under Section 13(a), which provides for aiding-and-abetting liability for a violation of the CEA or accompanying rules. See id. § 13c(a).

Both control person and aiding-and-abetting liability "require an underlying violation." U.S. Commodity Futures Trading Comm'n v. Wilson, No. 13-CV-7884-RJS, 2018 WL 6322024, at *21 (S.D.N.Y. Nov. 30, 2018). In Counts Two and Three, the Commission contends that the underlying violation was Najar's price manipulation and fraudulent misrepresentations and omissions, and that Rivoire controlled and aided and abetted Najar. For the same reasons that the parties' motions for summary judgment are denied as to Rivoire's alleged primary violations, each party also fails to meet its summary judgment burden as to

Najar's alleged primary violations and, consequently, as to Rivoire's alleged secondary violations. See Terraform, 708 F. Supp. 3d at 484 n.18.

Furthermore, Rivoire contends that he did not control Najar because he was not Najar's direct supervisor. (Docket entry no. 130, at 10.) Section 13(b), however, imposes control person liability on "[a]ny person who, directly or indirectly, controls any person who has violated any provision" of the CEA. 7 U.S.C. § 13c(b) (emphasis added). Direct supervision is thus not conclusive of control; rather, the Commission must show that the defendant "possessed the power or ability to control the specific transaction upon which the primary violation was predicated." Monieson v. Commodity Futures Trading Comm'n, 996 F.2d 852, 859 (7th Cir. 1993) (citation omitted); see Commodity Futures Trading Comm'n v. McDonnell, 332 F. Supp. 3d 641, 723-24 (E.D.N.Y. 2018) ("[E]ven indirect means of discipline or influence, short of actual direction, is sufficient to find liability as a controlling person."). The extent to which Rivoire actually controlled Najar is disputed. During the Pricing Call, Rivoire allegedly stood over Najar's shoulder, and Najar testified that Rivoire told him to "start selling." (56.1 St. ¶¶ 126, 174.) Najar also testified that the "entire reason to sell" at that time "was to push the screen," and he would not have been selling at that time had he not been trying to move the screen. (Id. ¶ 126.) According to the Commission, this is evidence that, during the live portion of the Pricing Call, Rivoire was "direct[ing] Najar when to start selling in order to move the Screens." (Pl. Mem. at 18.) Rivoire disputes this characterization, citing Najar's testimony that it was important that the ICAP screens reflect current market levels, that he understood Rivoire's instruction as a direction to ensure that ICAP's screens reflected current market prices, that Rivoire did not instruct him to "push the screen" to an inaccurate or artificial price, and that he did not think he was being asked to do anything wrong or improper. (56.1 St. ¶ 126.) Rivoire

also proffers evidence that it was common for traders to trade during a pricing call for risk management purposes. (Id.) These factual disputes over control likewise require the denial of both motions for summary judgment.

Rivoire lastly argues that he lacked the requisite "specific unlawful intent to further the underlying violation," as required for aiding-and-abetting liability. (Def. Mem. at 52 (quoting Amaranth, 730 F.3d at 181).) Aiding-and-abetting liability under the CEA requires the defendant to "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." Amaranth, 730 F.3d at 182 (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.)). The same reasons for the denial of summary judgment regarding the scope of primary liability under the CEA apply with equal force to aiding-and-abetting liability.

Accordingly, each party's motion is denied on the secondary liability claims against Rivoire in Counts Two and Three.

B. Motions to Exclude Expert Reports and Testimony

The Court next considers the parties' motions to exclude expert reports and testimony. Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. A party offering expert testimony under Rule 702 "must establish admissibility by a preponderance of the evidence." Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd., 392 F. Supp. 3d 382, 397 (S.D.N.Y. 2019). In evaluating the Rule 702 criteria under this preponderance of the evidence standard, the district court serves a "gatekeeping" function to ensure that an expert is qualified and that his or her testimony "rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993). This gatekeeping function "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).

1. The Commission's Motion to Exclude Alan S. Mittleman

In connection with this litigation, Rivoire retained Alan S. Mittleman, who prepared a report and testified in a deposition. Mittleman is tendered as an expert in trading and risk management of fixed income products, including interest rate swaps, and he has over twenty-five years of experience in trading, managing traders, and managing risk. (Mittleman Rep. ¶¶ 3-9.) Over his career, Mittleman has priced and traded issuer swaps and has participated in dozens of pricing calls for new bond issuances and issuer swaps. (Id. ¶ 7.) Mittleman proffers the following principal opinions:

a) "HSBC's trading with respect to the duration, swap spread, and basis risk associated with the JBIC issuer swap was reasonable, proportional, and consistent with good market practice." (Id. ¶ 12(a); see also id. ¶¶ 68-98.)

b) "HSBC did not cause or transact at any artificial prices." (Id. ¶ 12(b); see also id. ¶¶ 98, 122, 147, 151, 166, 226-39.)

c) "Rivoire did not improperly conceal HSBC's hedging activity from JBIC, nor did he (or anyone at HSBC) mislead JBIC or misrepresent any material facts," and "a sophisticated market participant such as JBIC would be expected to understand that a swap dealer such as HSBC would actively trade in the market before, during, and after the

pricing of an issuer swap in order to properly manage its risk." (Id. ¶ 12(c); see also id. ¶¶ 64-65, 169, 186-92, 224-25.)

d) ICAP screens "were beset by technical issues before and during the pricing call," and these issues were caused "solely by ICAP personnel." (Id. ¶ 12(d); see also id. ¶¶ 99-120, 186-192.)

e) Nothing in Najar's conversations with McDonnell "was indicative of misconduct. These communications reflected normal interactions between a trader and his broker . . . ." (Id. ¶ 12(e); see also id. ¶¶ 134-56.)

f) Najar's communications with O'Reilly "should be understood as immature, joking commentary between two relatively junior work colleagues" and "not evidence of misconduct" or a "'prediction' on the success of the alleged "manipulative scheme.'" (Id. ¶ 12(f); see also id. ¶¶ 157-68.)

g) "Rivoire's communications with senior HSBC personnel related to the mispricing of the issuer swap component . . . were reasonable and consistent with normal practice for a senior manager of a rates trading business." (Id. ¶ 12(g); see also id. ¶¶ 169-92.)

h) Rivoire's communications related to trades in connection with the Swap were "appropriate" and "none of Rivoire's communications suggested or encouraged fraud, market manipulation, or other improper activity." (Id. ¶ 12(h); see also id. ¶¶ 124-25, 169-92.)

i) "There was nothing inappropriate in Rivoire joining the pricing call and managing the latter part of the call . . . . During the pricing call, Rivoire did not mislead or pressure JBIC." (Id. ¶ 12(i); see also id. ¶¶ 186-92.)

The Commission seeks to exclude all of Mittleman's expert report and testimony, arguing that Mittleman lacks the expert qualifications to testify as to certain matters, that certain of his opinions are unreliable, that his extended framing of the factual narrative is improper argument rather than expert input, and that, to the extent any of his proposed testimony would pass Rule 702 scrutiny and be relevant, it should be excluded pursuant to Federal Rule of Evidence 403 because its probative value would be substantially outweighed by the risk of jury

confusion and unfair prejudice. For the reasons set forth below, the Commission's motion to exclude is granted in part and denied in part.

i. Qualification

In performing a Rule 702 analysis, a court must first assess "whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." Nimely v. City of New York, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quoting FED. R. EVID. 702). This requires analyzing "the totality of the witness's background to determine whether he or she exhibits any one or more of the qualifications listed in Rule 702 . . . with respect to a relevant field." Washington v. Kellwood Co., 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). The court should "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony" — the two must overlap. United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004). "[I]t is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." Nimely, 414 F.3d at 399 n.13.

Mittleman opines that Najar's transactions on July 11, 2012, were executed at prices that reflected "the normal market forces of supply and demand" and that HSBC did not "cause or transact at any artificial price." (Mittleman Rep. ¶ 12(b).) However, the record does not demonstrate that Mittleman is qualified to testify on the economic concepts of supply and demand; Mittleman is not an economist. (Docket entry no. 123-5 ("Mittleman Dep.") at 210 ("I studied economics, but I'm not a certified economist, no.").) Rivoire does not dispute Mittleman's lack of expertise in economics. Instead, Rivoire contends that Mittleman has relevant experience in pricing issuer swaps and quoting market prices for issuer swaps. (Docket entry no. 127, at 19-20; see Mittleman Rep. ¶¶ 3-9.) Mittleman's pricing and transaction

experience does not, however, qualify him as an expert in "the normal market forces of supply and demand"; he merely seeks to bolster Rivoire's argument on key legal conclusions. See Densberger v. United Techs. Corp., 297 F.3d 66, 74 (2d Cir. 2002) (reiterating the "well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions" (citation omitted)).

This is made clear by the unreliable methodology employed by Mittleman. Lacking any basis in economic analysis for his opinions, Mittleman instead relies on ipse dixit assertions from personal experience to conclude that, so long as there is a buyer and a seller, the resulting price will reflect supply and demand. (E.g., Mittleman Rep. ¶ 98 ("Najar traded $1.65 billion out of the $2 billion of basis spreads needed to hedge. There was adequate liquidity for each of the products HSBC traders needed to trade . . . . All of the prices at which HSBC traded reflected the normal interplay of supply and demand."); id. ¶ 147 ("Najar initially offered to sell at higher prices but being unable to find any bidders willing to transact, he lowered his offer until his supply met other market participants' demand.").) Such simplistic conclusions are neither indicative of relevant expertise nor helpful to a factfinder.

Likewise, Mittleman is not qualified to testify as an expert that the ICAP screens "were beset by technical issues before and during the pricing call" and that those issues were caused "solely by ICAP personnel." (Id. ¶ 12(d).) As Mittleman himself conceded, he has never managed a broker screen, been involved in the coding or other back-office work that is involved in running a broker screen, or worked for a broker. (Mittleman Dep. at 199.) For his part, Rivoire notes Mittleman's representations that he has had personal experience with using broker screens throughout his career. (Mittleman Rep. ¶ 7.) Nothing in Mittleman's report or testimony demonstrates, however, that simply using a screen provides the expertise required to opine — as

Mittleman does here — on the technical aspects of broker screens or the causation of problems with such screens. Indeed, Mittleman simply draws on statements in the background record provided to him that there were technical problems with the screens. He brings no relevant expertise to the inquiry. See In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (precluding an expert from providing a "narrative of the case which a juror is equally capable of constructing" (citation omitted)).

ii. Reliability

The opinions conveyed in Mittleman's report and testimony also lack demonstrable reliability.[8] To assess reliability, courts consider whether "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." FED. R. EVID. 702(b)-(d). Courts may also consider other factors in assessing whether an expert's methodology is reliable, including:

> (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error associated with the technique along with the existence and maintenance of standards controlling the technique's operation; and (4) whether the technique or theory has been generally accepted in the scientific community.

Astra Aktiebolag v. Andrx Pharms., Inc., 222 F. Supp. 2d 423, 487 (S.D.N.Y. 2002) (citing Daubert, 509 U.S. at 592-95). These factors are only illustrative, however, and courts have also considered other factors in analyzing reliability. Id. Moreover, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to

8 Even though the Commission does not explicitly raise the issue of reliability, the Court may consider it sua sponte. See Brenord v. Cath. Med. Ctr. of Brooklyn & Queens, Inc., 133 F. Supp. 2d 179, 188 n.4 (E.D.N.Y. 2001).

existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). If a court concludes that "there is simply too great an analytical gap between the data and the opinion proffered," it should exclude the expert opinion evidence. Roman v. Sprint Nextel Corp., No. 12-CV-276-VEC, 2014 WL 5026093, at *3 (S.D.N.Y. Sept. 29, 2014) (quoting Joiner, 522 U.S. at 146).

Mittleman presents his information in a manner that does not indicate reliability, drawing conclusions favorable to Rivoire by making his own credibility determinations concerning witness testimony and generally grounding his opinions with broad references to his own personal experience. Mittleman states that Rivoire's "push the screen" email "should be understood . . . as normal and appropriate guidance for a senior rates manager to give to a junior basis trader in the context of a large and challenging transaction." (Mittleman Rep. ¶ 124.) The primary basis for Mittleman's opinion is a general reference to his personal experience. He cannot even recall any specific examples of the term "push the screen" being used. (Mittleman Dep. at 180.) The only other apparent basis for Mittleman's conclusion is his reliance on the interpretation offered by Joseph Mosca. (Mittleman Rep. ¶ 125 (explaining that Mittleman's interpretation was similar to "Mosca's interpretation of Rivoire's comment").) Mosca's testimony cannot provide sufficient support for Mittleman's opinion because reliance on a fact witness's interpretive opinion is inappropriate and not a reliable methodology. See Nimely, 414 F.3d at 398.

Paragraphs 12(c), 64 to 65, 169, 186 to 192, and 224 to 225, in which Mittleman opines that "a sophisticated market participant such as JBIC would be expected to understand that a swap dealer such as HSBC would actively trade in the market before, during, and after the pricing of an issuer swap in order to properly manage its risk" (Mittleman Rep. ¶ 12(c)), and

paragraphs 12(e) through (i) and 134 to 192, in which Mittleman proffers his interpretation of various communications, also suffer from the same defects. (E.g., id. ¶ 64 ("Any participant in an interest rate swap transaction would be expected to know that it is commonplace and necessary for dealers to trade in the market around the pricing of a large deal for risk management purposes."); id. ¶ 138 ("[I]n my experience, I have found it prudent to give brokers advanced notice of a potential deal pricing if the deal was being priced off a certain screen.").)

iii. Impermissible Factual Narrative, Legal Conclusions, and Rule 403

Mittleman's report is also replete with impermissible factual narrative and legal conclusions. "[I]t is axiomatic that an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms . . . ." Highland Cap. Mgmt., L.P. v. Schneider (Highland I), 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005) (quoting Roundout Valley Cent. Sch. Dist. v. Coneco Corp., 321 F. Supp. 2d 469, 480 (N.D.N.Y. 2004)). Yet Mittleman's report reaches numerous legal conclusions about whether Rivoire engaged in a manipulative or deceptive scheme or made misrepresentations. (E.g., Mittleman Rep. ¶ 12(c) ("Rivoire did not improperly conceal HSBC's hedging activity from JBIC, nor did he (or anyone at HSBC) mislead JBIC or misrepresent any material facts.")); see United States v. Scop, 846 F.2d 135, 140-42 (2d Cir. 1988) (reversing convictions where expert had opined about "'manipulation' and 'fraud,'" thus presenting "legal conclusions that were highly prejudicial and went well beyond his province as an expert in securities trading"). Mittleman's report also repeatedly refers to Rivoire's trading and communications as "appropriate," "reasonable," and "consistent with good market practice" (Mittleman Rep. ¶ 12(a)) and repeatedly asserts that communications by Rivoire and others were "appropriate" or otherwise consistent with undefined norms of behavior (e.g., id. ¶ 12(h)). This is impermissible because it "may suggest to the jury that their job is done, that they have been told the answer to an ultimate question." Sec. & Exch. Comm'n v. Tourre, 950 F. Supp. 2d 666,

678 (S.D.N.Y. 2013). These types of legal conclusions "cannot be saved by couching [the] opinion as 'industry custom and practice.'" Highland Cap. Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 182-83 (S.D.N.Y. 2008).

Just as problematic is the fact that Mittleman's entire report is largely and primarily a factual narrative. See Tourre, 950 F. Supp. 2d at 675 ("It is . . . inappropriate for experts to become a vehicle for factual narration."). Large swaths of Mittleman's report are nothing more than summaries of the factual record of this case, with purported analysis that is backed by no reliable methodology. (E.g., Mittleman Rep. ¶¶ 68-98 (providing a factual narrative of the "specifics of the 2012 JBIC transaction"); id. ¶¶ 99-120 (same as to the "ICAP screen issues"); id. ¶¶ 121-92 (same as to various communications and actions involving Najar and Rivoire).)

Finally, even if the portions of Mittleman's report and testimony that are challenged passed muster under Rule 702, they should be excluded under Rule 403. What little probative value Mittleman's report and testimony have "is far outweighed by the danger that the jury would accord too much weight to such opinions because they come from the mouth of a" purported expert. Tchatat v. City of New York, 315 F.R.D. 441, 447 (S.D.N.Y. 2016). These flaws infect all of the portions of Mittleman's report mentioned above. (See, e.g., Mittleman Rep. ¶¶ 12(b)-(i), 64-65, 98-120, 122, 124-25, 147, 151, 166, 169, 134-92, 224-39.)

iv. Surviving Portions

That said, the Commission has not demonstrated a basis for excluding Mittleman's general explanations of swaps, hedging, and market practice and how Najar's trades measured against market practice. These portions properly lay a factual foundation for evaluation of the parties' arguments as to how the factfinder should interpret the communications and actions that are at issue. See In re Platinum-Beechwood Litig., 469 F. Supp. 3d 105, 118

(S.D.N.Y. 2020). These portions are also sufficiently reliable and do not impermissibly opine on legal conclusions. See Primavera Familienstifung v. Askin, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) ("[I]t is proper for an expert to testify as to the customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards.").

The Commission's motion is denied to the extent it seeks to exclude those portions of Mittleman's proposed testimony that it has not challenged specifically. (See, e.g., Mittleman Rep. ¶¶ 12(a), 68-98.) Likewise, the Commission did not articulate any basis for its objections to Mittleman's rebuttal proffers in response to the Commission's experts, so those portions also survive. (See, e.g., id. ¶¶ 193-239.)

2. Rivoire's Motion to Exclude Opinions of Terence Mark

In connection with this litigation, the Commission retained Terrence Mark, who prepared a report and testified in a deposition. Mark proffers that he is an expert in trading U.S. Treasuries and basis swaps and that, over a 42-year career, he has interacted with large and sophisticated public sector bond issuers, including JBIC; negotiated ISDA (International Swaps and Derivatives Association) agreements between swap counterparties; and participated in risk management and pricing calls for interest rate swap transactions. (Docket entry no. 129-2 ("Mark Rep.") § 1.1; docket entry no. 129-6 ("Mark Dep.") at 14-18.)

Rivoire moves to exclude the opinions expressed in section 5 of Mark's report, where Mark opines that four actions undertaken by Rivoire and Najar (allegedly at the direction of Rivoire) "would have been important to the decision of a reasonable counterparty, such as JBIC, to consider HSBC as a counterparty and ultimately enter into the trade with them." (Mark Rep. § 5.5.2.) Specifically, those four actions were:

> (I) reducing normal trading volumes in advance of execution order to facilitate the efforts to push the screen;

> (II) engaging with a broker and a firm (ICAP) which was not Mr. Najar's preference in his normal day-to-day activities;
>
> (III) taking steps both before and during the pricing call to ensure that HSBC had control over the screen; and
>
> (IV) making misleading statements to the issuer at the time of the execution of the pricing of the [Swap].

(Id.) Mark opines that "had JBIC been aware of any or all of these actions in advance, this knowledge would have been an important consideration in a decision whether to withdraw the [Swap] mandate from HSBC and work with another counterparty, to which they had access." (Id. § 5.5.3.) Mark also opines that "[h]ad any reasonable counterparty/issuer been aware of any or all of the 4 actions taken by Mr. Rivoire or his subordinates at his direction, it would have deemed them important and in my experience would have resulted in a decision to seek another counterparty, despite the potential for a delay in issuing the bonds." (Id. § 5.5.4.)

Mark's testimony about JBIC's reasonable expectations in section 5 of his report is strikingly similar to Mittleman's testimony about that same topic. Unsurprisingly, Mark's testimony suffers from the same reliability defects, and it must be excluded. Mark opines on "[t]he general expectations that an issuer would have when considering entering into a derivative transaction with a particular counterparty" and "[t]he factors that [he] would expect an issuer to consider when mandating a derivative counterparty." (Id. § 5.1.2.) His analysis, however, is conclusory. Mark proffers nothing more than generalized, conclusory assertions based on his personal experience. (See, e.g., id. § 5.2.2 ("In my experience, bond issuers and hedgers are careful about who they do business with and seek to mitigate these risks by a due-diligence process . . . ."); id. § 5.2.4 ("The process for an issuer to select banks . . . will vary, but in my experience, there are a number of general expectations . . . .").) Indeed, Mark himself acknowledges that the prospective issuer's perspective is subjective, stating that "the issuer

applies subjective factors in order to move forward with confidence that the issue will be placed successfully." (Id. § 5.3.3.) Mark's opinions are thus nothing more than his own subjective opinion on JBIC's subjective attitude and actions. See Daubert, 509 U.S. at 590 (holding that expert opinions must reflect more than "subjective belief or unsupported speculation").

Mark's analysis is also unhelpfully simplistic because it simply addresses "lay matters which a jury is capable of understanding and deciding without the expert's help." Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 708 (2d Cir. 1989). Mark opines that the "points a reasonable issuer would consider important when mandating a counterparty" are: "strength of an existing relationship," "transparency, integrity, and trust," and "ability to distribute and execute necessary hedges." (Mark Rep. § 5.3.) These are non-technical concepts that a lay juror could understand without the help of an expert.

Accordingly, Rivoire's motion is granted insofar as it is directed at Terence Mark's proposed testimony, and Mark is precluded from testifying on the four conclusions expressed in Section 5 of his report.

3. Rivoire's Motion to Exclude Opinions of Anjan V. Thakor

In connection with this litigation, the Commission retained Anjan V. Thakor, who prepared a report and testified in a deposition. Thakor is proffered as an expert in financial economics and banking, financial instruments, and risk management. (Docket entry no. 129-1 ("Thakor Rep.") ¶¶ 1-8.) Throughout his career, Thakor has published numerous academic articles on topics in economics, banking, and finance. (Id. ¶ 2.)

Rivoire challenges the following portions of Thakor's report:

1. Thakor opines that, as a result of Rivoire's "push the screen" email, Najar took a number of steps he otherwise would not have taken. (Id. ¶¶ 15, 18, 40-43, 45; see also id. ¶ 13.)

2. Thakor opines that Najar's conduct was "uneconomic" because he "did not behave in an economically-optimizing manner insofar as the trading was concerned." (Id. ¶¶ 19, 44-53, 62-63; see also id. ¶ 13.)

3. Thakor opines that Najar's "non-standard and "uneconomic trading" was deceptive to the market and inconsistent with the expectations of a "reasonable swap counterparty," which would have wanted to know about Rivoire and Najar's actions. (Id. ¶¶ 20-21, 23, 54-57, 61-62.)

4. Thakor opines that other market participants "who would have been looking at these Reuters screens" were "also affected by the induced price distortion." (Id. ¶¶ 58, 62; see also id. ¶ 22.)

5. In the factual background section, Thakor references the sizes of the global stock, bond, and interest rate swap markets. (Id. ¶¶ 24-26.)

6. In his analysis, Thakor analogizes Rivoire's and Najar's conduct to the savings and loan crisis of the 1980s. (Id. ¶ 56.)

Rivoire in essence argues that Thakor's foregoing opinions lack a reliable methodology sufficient to satisfy Rule 702 and that portions of Thakor's background section are unduly prejudicial under Rule 403. For the reasons stated below, Rivoire's motion is granted in part and denied in part.

i. The Four Opinions

Each of Thakor's four challenged opinions lacks demonstrable reliability. With respect to the first three challenged opinions, Thakor provides no framework for assessing what constitutes "uneconomic" and "non-standard" behavior. (E.g., Thakor Rep. ¶ 18 ("[Najar] took a number of steps that he would not have otherwise taken and traded in a manner that he would not ordinarily have traded in order to implement Rivoire's instruction to 'push the screen as much as we can.'"); id. ¶ 19 ("Najar did not behave in an economically-optimizing manner insofar as the trading was concerned."); id. ¶ 45 ("From an economic standpoint, traders prefer to place their trades when market liquidity is high and they design trading strategies accordingly.").) At times, Thakor purports to reference economic concepts and he even cites economic literature on

occasion. (E.g., id. ¶ 47 & n.26.) But there is no further analysis to connect the concepts or literature to Thakor's ultimate conclusions. (E.g., id. ¶ 45 ("[Najar] concentrated his trades with a single broker, ICAP, specifically so that his trades would impact the Reuters screen in a way that would benefit HSBC."); id. ¶ 47 ("Najar was trading in a way that appeared to be what one might do to maximize the price impact.").) Likewise, Thakor's fourth challenged opinion relies on nothing more than ipse dixit. (E.g., id. ¶ 58 ("Market participants who used the reference screens would reasonably expect those screens to reflect fair market value . . . ."); see also id. ¶¶ 22, 62.)

Even setting aside the reliability issues with Thakor's report and opinion, Thakor's purported review of the evidence is nothing more than his interpretive opinion of the factual record. (E.g., id. ¶ 46 (citing Najar's testimony for the proposition that Najar "concentrated his trades to immediately precede the pricing"); id. ¶ 48 (citing Najar's testimony for the proposition that Najar "was committed to selling $500 million of 5y 6m3m basis swaps in order to accomplish his goal, regardless of how low the bids would go").) Such factual narrative testimony by an expert is inappropriate. See Tourre, 950 F. Supp. 2d at 675.

ii. The Remaining Objections

Rivoire's objection to paragraphs 24 to 26 and 56 invokes Federal Rule of Evidence 403, which permits the exclusion of expert evidence where its unfairly prejudicial effect substantially outweighs its probative value. See Nimely, 414 F.3d at 397. Specifically, Rivoire argues that Thakor's references to the sizes of the global stock, bond, and interest rate swap markets in paragraphs 24 to 26 and Thakor's analogy to the savings and loan crisis of the 1980s in paragraph 56 are irrelevant and present a risk of confusion and unfair prejudice. (Docket entry no. 119 ("Def. 702 Mem.") at 20 n.7.) The Court is not persuaded that the material should be excluded. Although they draw on non-contemporaneous data and points of

comparison, Thakor's submissions in paragraphs 24 to 26 provide general context as to the magnitude of derivatives as elements of economic activity, and the savings and loan crisis is invoked in aid of a moral hazard argument. While neither may be particularly probative, Rivoire has not explained how their probative value would be substantially outweighed by any risk of confusion or unfair prejudice. Accordingly, the motion is denied insofar as it seeks to strike these paragraphs and related testimony.

4. Rivoire's Motion to Exclude Testimony of Justin Regus

In connection with this litigation, the Commission retained Justin Regus, who prepared a report and testified in a deposition. Regus is tendered as an expert in economic and financial analysis and has over 20 years of experience in those fields. (Regus Rep. at 3.) He has performed such analyses for prominent international professional services firms in connection with litigation, transactions, and other disruptive events. (Id.) He is also experienced in reviewing financial market data, including equities, bonds, derivatives, interest rates and exchange rates. (Id.)

Rivoire challenges the following opinions proffered by Regus:

1. "On the morning of July 11, 2012, both of the inputs to the pricing of the interest rate swap that were determined during the second part of that day's pricing call moved in a direction that favored HSBC. Compared to the levels of those inputs prior to Mr. Najar's first phone call to Mr. McDonnell on July 11, the changes resulted in approximately $710,111 in additional cash flow from JBIC to HSBC over the five-year term of the interest rate swap." (Id. at 8-9.)

2. "During the July 11, 2012 pricing call, the price of a one-week delay in a USD LIBOR five-year 3-month/6-month basis swap was set at –0.3 bp. Relative to other values of the price of a one-week delay during July 2012, the value of –0.3 bp was an outlier. In the first ten days of July 2012, the price of a one-week delay had never been as low as –0.3 bp. Throughout the month of July 2012, only 2% of prices of a one-week delay in a USD LIBOR five year 3-month/6-month basis swap were as low as –0.3 bp. The price of the one-week delay was as low as –0.3 bp for only seventy minutes in July 2012,

representing 0.16% of the month. When the price of the one-week delay did reach –0.3 bp, it tended to change again to a different level much more quickly than when the price was at higher levels." (Id. at 9.)

3. Regus's characterization of certain communications involving Najar and Rivoire and certain communications involving Najar and McDonnell. (Id. at 7, 14.)

4. Regus's opinion that "the ICAPUSDBASIS screen was more widely available than the 19905 screen" and that "any Reuters subscriber could access ICAPUSDBASIS, whereas the 19905 screen was part of a group of pricing screens that required an additional subscription." (Id. at 12.)

As to the first opinion, Rivoire's objection is sustained in part. As to the second opinion, Rivoire's objection is overruled. Finally, as to the third and fourth opinions, Rivoire's objections are sustained.

i. "Additional Cash Flow"

First, Regus opines that, compared to the values of the Swap pricing inputs (i.e., the spot price of Five-Year Basis Swaps and the Forward Rate Adjustment) from around 7:17 AM, the values ultimately used to price the Swap resulted "in approximately $710,111 in additional cash flow" from JBIC to HSBC. (Regus Rep. at 9.) In challenging Regus's opinion, Rivoire contends that Regus fails to establish that 7:17 AM was a "proper baseline" because Regus did not analyze whether the screen prices at that time were accurate. (Def. 702 Mem. at 30-32.) Rivoire also faults Rivoire for not analyzing why the screen prices moved (i.e., whether the movement was due to allegedly improper conduct, the purported technical issues at ICAP, or the regular movement of prices). (Id.; see also Mittleman Rep. ¶ 201 (criticizing Regus's report by asserting that "[a] proper analysis of what one may consider to be 'additional cash flow' would require studying and determining a market-based, actionable 'but-for' price of execution").)

Notably, Rivoire does not object to Regus's methodology. Indeed, Rivoire's expert, Mittleman, states that Regus "correctly measures the divergence." (Mittleman Rep. ¶ 196.) Instead, Rivoire disputes the characterization of the cash flows as "additional," which goes to the issue of causation (i.e., whether the cash flows were caused by Rivoire and Najar or whether the cash flows were caused by the normal movement of prices). (See docket entry no. 131, at 7 (faulting Regus for not "attempt[ing] to 'analyze the cause' of a change in cash flows between two arbitrarily-selected points in time").) Because Regus has proffered no analysis on the issue of causation, Regus is barred from linking the differential to the Pricing Call and from characterizing the difference as "additional" cash flow. Regus may, however, testify to the mathematical differential between projected cash flow based on the earlier price and the price at which the transaction was executed.

ii. "Outlier" Forward Rate Adjustment

Second, Regus opines that a Forward Rate Adjustment of –0.3 bp was an "outlier" because the Forward Rate Adjustment "was as low as –0.3 bp for only seventy minutes in July 2012, representing 0.16% of the month." (Regus Rep. at 9.) Rivoire contends that Regus's opinion is flawed because "Regus did not opine on the reasons for the volatility in the relationship between the spot and one-week forward prices, nor did he have an opinion on what caused ICAP to display the one-week forward level of –0.3 or whether it was an accurate value." (Def. 702 Mem. at 32.) Rivoire's objections are unavailing because they go to weight, not admissibility. See GeigTech E. Bay LLC v. Lutron Elecs. Co., No. 18-CV-05290-CM, 2023 WL 6614486, at *21 (S.D.N.Y. Sept. 20, 2023).

Regus's opinion is based on reliable data and a reliable methodology. He tabulated the values of the Forward Rate Adjustment for the month of July 2012, as obtained from the USDBASIS screen, and then calculated the percentage of time that the adjustment value

was as low as –0.3 bp. (Regus Rep. at 19-25.) At trial, Rivoire may introduce evidence to explain the reasons why the Forward Rate Adjustment was –0.3 bp, but such evidence does not require exclusion of Regus's opinion. Accordingly, Rivoire's motion is denied to the extent it seeks to bar the description of 0.3 as an "outlier."

iii. Characterization of Communications

Rivoire also objects to two portions of Regus's report where Regus interprets certain communications. Regus states that prior to and during the Pricing Call, Rivoire and Najar "discussed trying to push the prices on a relevant Reuters screen, and Mr. Najar participated on calls with Mike McDonnell at ICAP in attempts to ensure that ICAP data reflected on the Reuters screens moved in a direction that was favorable to HSBC." (Regus Rep. at 7.) Regus also states that Najar "demanded that Mr. McDonnell from ICAP lower the spot and one-week forward basis swap prices on the 19905 and ICAPUSDBASIS screens." (Id. at 14.) These sentences are inadmissible because Regus is testifying as to a factual narrative and characterizing the motivations of the participants in the communications in ways that have no relevance to any of his admissible conclusions or to his putative expertise in the field. See Highland I, 379 F. Supp. 2d at 469. Accordingly, Regus is precluded from testifying to other individuals' motivations for making statements or taking actions, including testimony embodying the narrative presented on page 7 of the report.

iv. The USDBASIS Screen Was "More Widely Available" than the 19905 Screen

Rivoire similarly objects to Regus's statement that "the ICAPUSDBASIS screen was more widely available than the 19905 screen" and that "any Reuters subscriber could access ICAPUSDBASIS, whereas the 19905 screen was part of a group of pricing screens that required an additional subscription." (Regus Rep. at 12.) This proposed testimony is inadmissible

because it is impermissible factual testimony from a non-percipient witness that has no relevance to any of Regus's conclusions. See Highland I, 379 F. Supp. 2d at 469. Accordingly, Regus' proposed testimony concerning the availability of and access to the screen in question is precluded.

## III. Conclusion

For the foregoing reasons, the Commission's motion for summary judgment on all counts is denied in its entirety, Rivoire's cross-motion for summary judgment on all counts is denied in its entirety, the Commission's motion to exclude portions of the expert opinion of Alan S. Mittleman is granted in part and denied in part, and Rivoire's motion to exclude portions of the expert opinions of Terence Mark, Justin Regus, and Anjan V. Thakor is granted in part and denied in part. Docket entry nos. 101, 110, 118, and 121 are hereby resolved.

A Final Pretrial Conference is hereby scheduled for **Friday, January 22, 2027, at 12:00 PM**, and the parties are directed to consult, exchange documents, and make submissions in accordance with the Pretrial Scheduling Order filed contemporaneously herewith. The parties are further directed to arrange promptly for a settlement conference with Magistrate Judge Gabriel W. Gorenstein, to whom this case will be referred for that purpose, and to file a joint status report, including their estimate of the amount of time that will be required for any contemplated trial, by **Tuesday, December 1, 2026**.

SO ORDERED.

Dated: New York, New York
September 24, 2026

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge